622 P.2d 288

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Marcia G. HARRISON,
Defendant-Appellant.**

**No. 4742.**

Court of Appeals of New Mexico.

Dec. 30, 1980.

Mary Lou Carson, Santa Fe, for defendant-appellant.

Jeff Bingaman, Atty. Gen., Charles F. Noble, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

HENDLEY, Judge.

Convicted of possession of heroin, defendant appeals asserting that "[t]he search of the defendant's person exceeded the scope of the warrant and affidavit. No probable cause for the search existed, nor were there exigent circumstances which would justify a warrantless search."

Detectives Florio, Smith and Garcia, pursuant to a search warrant, were authorized to search a motel room and a named occupant, Dionel Tenorio. The applicant for the search warrant, Florio, knew defendant would be in the room. Florio testified, "We met with the informant again prior to executing the warrant to make sure he was in the room. At that time he also mentioned that Marcia Harrison was in the room. I did not go back and redo the affidavit."

Garcia testified:

Q. Okay. You had previous information that she or Dionel Tenorio may have had that specific weapon?

A. Right. I didn't know which one of them would have it. But we had information that one of them did.

Q. Did you have any previous information that either of them had any other weapons?

A. Oh, yes. I had had a previous encounter with both of the same subjects, Marcia Harrison and Dionel Tenorio, some month and a half or two months earlier, in which I had personal knowledge that they did have access to weapons.

. . . . .

Q. Did you ever tell Detective Florio that you had knowledge that either Miss Harrison or Mr. Tenorio may be armed with this pen gun?

A. Prior to execution of the search warrant, we all had knowledge—myself, Florio and Detective Smith, that one or the other may be armed.

Q. Armed with a pen gun?

A. With the pen gun, yes.

Q. Did you put that in the affidavit and search warrant?

A. We didn't find out about the pen gun until after the affidavit was typed and ready to be brought to a District Attorney.

Upon reaching the room, Garcia knocked and Smith placed the passkey in the lock. There was no answer, so they entered. Tenorio was lying on the bed and defendant was sitting on its edge. Upon seeing the officers, defendant ran to the bathroom, but Garcia grabbed her before she could reach for the commode.

Smith testified:

A. ... Through information that we had prior to going in the room, we had expected to find a pen gun. On the chance that it would be in the purse, I looked through the purse and found the pen gun and some syringes.

. . . . .

Q. At the time that you found the pen, had she emptied her pockets, had she searched her pockets?

A. No, I think I found the pen gun first.

Defendant was placed against the wall in a frisking position, but because she was a female, they did not search her, but directed her to pat down her pockets. As defendant was patting down her pockets, Garcia could see that there was something in them but could not tell what the items were. He testified that the bulges observed gave him reason to believe that they may be weapons. He ordered her to remove the item from her left rear pocket. The item was $125 in United States currency.

Garcia then had her pat her left front pants pockets and then empty the pocket. Garcia testified, "From her left front pants pocket, I think it was probably, the way it was wrapped, maybe two inches in length. It was wrapped up, a baggie, in a plastic baggie wrapped up together with a rubber band or else it was tied together." Defendant pulled out pills and tinfoil-wrapped objects. The same occurred with regard to her right front pants pocket.

On cross-examination, Detective Garcia further testified as to the size of a pen gun, which was a little longer and a little bit fatter than the pen held by defense counsel. He stated that when he saw the bulge in defendant's pocket from the money he did not believe that bulge was the outline of a pen gun. However, even though she was wearing tight pants, he did believe that it could have been a .25 automatic or any type of weapon. The package that she took from her left front pocket was about two inches in length. It was a baggie wrapped up with a rubber band or tied. It contained pills and about ten tinfoil packets. It was perhaps as long as a cigarette package, but not as wide and without as much bulk. The package from the right pocket was narrower, less bulky. Defendant was placed under arrest after her pockets were emptied.

During the search, Detective Smith saw a purse on the bed and proceeded to search it

for the pen gun, which was in the bag. Detective Smith found the pen gun, and then observed the search of defendant's pockets.

In *State v. Blea*, 92 N.M. 269, 587 P.2d 47 (Ct.App.1978), this Court held that a search for weapons is proper even though the officers are without a reasonable belief that the person is armed and presently dangerous, so long as the person fits a class of people who are "often armed and often will attempt to leave the scene, using their vehicle 'for a fast getaway'."

In *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the police based upon information from a reliable informant, obtained a search warrant for a specified place and a specific person—The Aurora Tap Tavern and Greg the bartender. The warrant authorized a search for evidence of the offense of possession of a controlled substance. Seven or eight officers proceeded to the tavern and, upon entering, made a cursory search for weapons of all customers. The officer who first patted down Ybarra felt a cigarette pack containing certain objects. After the pat down, the officer returned to Ybarra and frisked him again and removed the cigarette pack from his pocket. Inside the pack were six tinfoil packets of heroin.

In reversing Ybarra's conviction, the Supreme Court held:

It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. [Footnote omitted.] But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. *Sibron v. New York*, 392 U.S. 40, 62–63 [88 S.Ct. 1889, 1902, 20 L.Ed.2d 917.] Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places. See *Rakas v. Illinois*, 439 U.S. 128, 138–143, 148–149 [99 S.Ct. 421, 427–430, 433, 58 L.Ed.2d 387]; *Katz v. United States*, 389 U.S. 347, 351–352, [88 S.Ct. 507, 511, 19 L.Ed.2d 576].

Each patron who walked into the Aurora Tap Tavern on March 1, 1976, was clothed with constitutional protection against an unreasonable search or an unreasonable seizure. That individualized protection was separate and distinct from the Fourth and Fourteenth Amendment protection possessed by the proprietor of the tavern or by "Greg." Although the search warrant, issued upon probable cause, gave the officers authority to search the premises and to search "Greg," it gave them no authority whatever to invade the constitutional protections possessed individually by the tavern's customers. [Footnote omitted.]

The Supreme Court went on to state:

Upon seeing Ybarra, they neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening. At the suppression hearing, the most Agent Johnson could point to was that Ybarra was wearing a ¾–length lumber jacket, clothing which the State admits could be expected on almost any tavern patron in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.

The *Ybarra* court, in discussing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), stated: "The 'narrow scope' of

the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place."

█ The testimony of the officers was that they had information that the defendant or Tenorio had a pen gun. Assuming that they, therefore, had reasonable belief that the defendant was armed, there was no testimony that showed that they reasonably believed that she was also presently dangerous. The defendant had nothing in her hands and did not act in a threatening way, except to run away towards the bathroom and reach for the commode. The mere fact that she was present while a search warrant was being executed is not sufficient. *Ybarra, supra.* This absence of a showing that the officers reasonably believed the defendant was dangerous in itself makes the search of the contents of defendant's pockets invalid.

Even assuming that the officers had a reasonable belief that defendant was dangerous, the State's argument that the detective who searched the defendant did not know that the pen gun had already been found is not an accurate reflection of the record. Detective Smith stated that after he found it he stood there watching Detective Garcia ordering a search of defendant. This testimony does not support a reasonable belief that defendant had a pen gun in her pockets at the time of the search. Neither was the belief that she had some other sort of weapon reasonable. The testimony of Garcia will not support a reasonable belief that the money or two-inch object in the front pocket was a weapon. The same duty of Detective Garcia to end the search once the gun was found extended to Detective Smith, who could easily have brought it to Detective Garcia's attention.

█ The State also contends that the search was valid as incident to an arrest. However, the mere fact that defendant ran in the direction of the bathroom did not provide reasonable grounds to believe that she unlawfully possessed heroin. *Compare State v. Garcia,* 83 N.M. 490, 493 P.2d 975 (Ct.App.1971). The State further contends that the search would be proper, based on the arrest, once the substance was found. This is incorrect. Because defendant was not arrested until *after* the heroin was found, the search cannot be justified as a search incident to arrest. *State v. Blea, supra.*

Insofar as *Blea, supra,* is contrary to *Ybarra, supra,* it is overruled.

The motion to suppress should have been granted.

Reversed.

IT IS SO ORDERED.

LOPEZ and WALTERS, JJ., concur.