[No. 7353–2–I.   Division One.   May 26, 1981.]

THE STATE OF WASHINGTON, *Respondent,* v. CLIFTON
BROADNAX, JR., ET AL, *Defendants,* STEVEN
ARTHUR THOMPSON, *Appellant.*

*Rebecca Baker,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *J. Robin
Hunt, Deputy,* for respondent.

WILLIAMS, J.—The defendant, Steven Arthur Thompson,
was charged and convicted of illegal possession of a nar-
cotic. His appeal to this court resulted in an affirmance, one

judge dissenting, *State v. Broadnax,* 25 Wn. App. 704, 612
P.2d 391 (1980). The Supreme Court considered his peti-
tion for review and returned the cause to this court "for
Decision in light of *State v. Hobart* [94 Wn.2d 437, 617
P.2d 429 (1980)]." We reaffirm.

The critical question, whether the police officers properly
frisked Thompson for weapons while engaged in a house
search directed by a court warrant, is controlled by the cor-
rect interpretation of the fourth amendment to the United
States Constitution protecting "[t]he right of the people to
be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures . . ." U.S.
Const. amend. 4.

In *State v. Hobart,* 94 Wn.2d 437, 617 P.2d 429 (1980),
police accosted the defendant for questioning at 1:30 a.m.
on October 18, 1977, because of the somewhat unusual
behavior detailed in the margin.[1]

One of the officers recognized Hobart as a person he had
arrested 5 years before for possession of marijuana and 3
years before for carrying a concealed weapon. Because of
this record and for his own safety, the officer got out of his
car and conducted a pat–down search for weapons, finding
none but detecting in Hobart's shirt pocket "two spongy
objects which he squeezed and concluded were balloons
containing narcotics." *Hobart,* at 440.

---

[1]"Two police officers, in their marked patrol car, were proceeding east on
Madison Street on Seattle's First Hill, when they observed an approaching Ply-
mouth Valiant 'quickly' turn north onto Summit Avenue, when it was about a
block away from them. They decided to follow the vehicle to see if they could
ascertain the reason for the turn. It proceeded slowly (about 20 miles per hour)
until it reached University Street, turned east, proceeded 1 block, then turned
south on Boylston Avenue where it entered a parking lot serving the Arcadia
Apartments, which had an entrance on University Street. The petitioner parked
his car and walked to the door of the apartment building, the patrol car close
behind him. He shook the front door, received no answer, looked up at the second
story windows and started walking back toward his car. At this moment Officer
Dornay, who had pulled the patrol car up at the curb in front of the apartment
house, called to him, asking if he were lost. The petitioner answered no, and said
that he was meeting a girlfriend. The petitioner was standing a few feet from the
officer at the time." *State v. Hobart,* 94 Wn.2d 437, 439, 617 P.2d 429 (1980).

The Supreme Court decided that the two earlier arrests did not give the officer reason to believe that Hobart was armed and presently dangerous, *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), so the search was illegal. Going on, the court, upon the assumption that the search was legal, determined that its scope went beyond one for weapons and became an exploration for narcotics and that was illegal.

The situation in this case is one of police officers under the command of a warrant preparing to search a private residence where narcotics had been offered for sale within the previous 24 hours. Broadnax and another person unknown to the police, appellant Thompson, were present[2] and told to put their hands up. A policeman then patted them down for weapons. While doing so, he felt a small bulge in Thompson's left shirt pocket, which he recognized as a balloon of heroin or some other substance. It is the propriety of this pat–down search which forms the basis for Thompson's appeal.

■ The keystone of the Fourth Amendment is reasonableness. The protective search for weapons must be tested against this objective standard:

> would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

*Terry v. Ohio, supra* at 21–22.[3]

■ In the open street, as in *Terry* and *Hobart,* and in a public tavern, as in *Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), it is inappropriate for police officers to accost citizens who are engaged in no criminal activity and who are not known to be dangerous

---

[2]A girl of 16 and an infant were also in the house but played no part. Only those facts necessary to an understanding and resolution of the case should be recited.

[3]In his dissent Judge Ringold relies upon a "reasonable subjective fear by the officers." There is no such test.

and search them for weapons. In a private residence where illegal drugs recently have been sold, it is appropriate for the officers to conduct a "frisk" for weapons before carrying out the command of a court to search the place. This is because a man of reasonable caution would do so for his own protection and for the safety of his colleagues. Such a situation is fraught with danger to begin with, *State v. Sloughter,* 14 Wn. App. 814, 545 P.2d 32 (1976), and the searching officers are particularly vulnerable to attack while discharging their duty.

In the open street scene of *Hobart,* an officer has a fair chance to protect himself through observation and maneuver. If he does not know the person contacted but senses danger, he may withdraw and continue surveillance. In the closed quarters of a house, the officer has no chance to protect himself while looking for evidence or contraband. If he does not know the person standing by but senses danger, he may not withdraw without disobeying the order of the court. As was said in *State v. Sloughter, supra* at page 819:

> The concern of the court in *Terry* for the protection of an officer in the lawful performance of his duties is even more pertinent today. Since that decision, it is a matter of common knowledge that the incidence of armed violence has dramatically increased. This is not surprising in view of the virtually unchecked accessibility and use of all types of deadly weapons. To require an officer, in the circumstances of this case, to await some furtive movement of the defendant before a protective pat–down search for weapons could take place would compound the officer's exposure to danger.

This is not to say that an officer searching a house pursuant to a warrant may routinely "frisk" everyone, that would be unreasonable. There are many conceivable situations where there would be no danger. But when going into a place under order of the court where there very well may be danger, reasonable caution calls for a "frisk" of those present.

> It is certainly reasonable for a police officer conducting a legal search of premises which he believes to be

involved in the sale of narcotics to frisk occupants and those coming to the house for weapons in order to protect himself against the use of such weapons. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889.

*People v. Nefzger,* 173 Colo. 199, 200, 476 P.2d 995, 996 (1970). In this case, on these facts, the court should encourage, not discourage, officers to protect themselves.

We note that in an arrest situation, even for driving with a revoked license, the "frisk" for weapons is routine. *United States v. Robinson,* 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973). *Accord, State v. Henneke,* 78 Wn.2d 147, 470 P.2d 176 (1970) (arrest of jaywalker). This is because the officer is subject to far greater danger from extended exposure than in the "fleeting contact resulting from the typical *Terry*–type stop." *Robinson,* at 235. In a house search the officer, in looking through cabinets and drawers, under furniture and into closets, is likewise exposed to danger for longer periods than in the *Terry*–type street scene.[4]

■ With reference to the pat–down search, the situation in *Hobart* and in this case are quite different, because the officer there first ascertained that the bulge was not a weapon and then proceeded to find out what it was. The same is true in *Ybarra.* In each of those cases, assuming that the officer had authority to assure himself that the bulge was not a weapon, he should not continue the search thereafter without a valid reason. *State v. Allen,* 93 Wn.2d 170, 606 P.2d 1235 (1980). In this case the officer identified the bulge as being a balloon of narcotics at the same time that he found it was not a weapon.

Reaffirmed.

SWANSON, J., concurs.

---

[4]During oral argument alternative solutions were discussed. Defense counsel suggested that Broadnax and Thompson could have been required to keep their hands up while being guarded by one of the four officers present. Or they could have been asked to leave; we do not know which would be the least intrusive. The simplest answer would have been for the police to abandon the search and return the warrant to the court issuing it.

RINGOLD, A.C.J. (dissenting)—I adhere to my dissenting opinion, *State v. Broadnax*, 25 Wn. App. 704, 713, 612 P.2d 391 (1980). The majority misperceives the teachings of *Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979) and *State v. Hobart*, 94 Wn.2d 437, 617 P.2d 429 (1980), and seeks to dilute Fourth Amendment and state constitutional guaranties.[5]

## THE MAJORITY OPINION

The majority opinion takes issue with the statement out of context in my dissent, *Broadnax* at page 716, that a *Terry*[6] stop and frisk is justifiable only when the officer has a reasonable subjective fear that the person stopped or frisked is armed. The test is subjective in that the officer must in fact have a fear that the person is armed; the test is objective, however, in that the fear must be based on articulable facts which make that fear reasonable under the circumstances. *Ybarra v. Illinois, supra.* Sergeant Scheuffele testified that he had no such fear, and Detective Buckland testified that he thought Thompson had already been arrested when he initiated the frisk. Despite the complete absence of any fear on the part of the officers and the fact that the frisk was undertaken for the purpose of the discovery of narcotics, the majority undertake to rationalize the officers' conduct after the fact by suggesting that the officers ought to have been fearful whether or not they actually felt any such fear. The correct approach first considers whether the officers had a subjective fear for their safety, then whether that fear was based on objective articulable facts. If the officers had no subjective fear, then the question must be why they undertook the frisk. Here, of course, the answer is that they were looking for narcotics.

---

[5]United States Constitution, amendment 4: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ."

Washington State Constitution, article 1, section 7: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

[6]*Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

The most disquieting feature of the majority opinion is that it purports to hold as a matter of law that any time police officers are searching the premises pursuant to proper authority they may frisk anyone thereon, although such frisks in the "open street" are not so permissible. According to the majority, then, the *Terry* rule applies everywhere except in one's home. The sanctity of the home as the refuge most imbued with the expectation of privacy has enjoyed long recognition in the law. *Boyd v. United States,* 116 U.S. 616, 630, 29 L. Ed. 746, 6 S. Ct. 524 (1885); *Dorman v. United States,* 435 F.2d 385 (D.C. Cir. 1970); *United States v. Reed,* 572 F.2d 412, 423 (2d Cir. 1978); *United States v. United States District Court,* 407 U.S. 297, 313, 32 L. Ed. 2d 752, 92 S. Ct. 2125 (1971). In *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 354, 50 L. Ed. 2d 530, 97 S. Ct. 619 (1976), the court said:

> It is one thing to seize without a warrant property resting in an open area or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property. . . situated on private premises . . .

Most recently in *Payton v. New York,* 445 U.S. 573, 589, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980), the court said:

> The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms . . .

*See also Steagald v. United States,* 451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642 (1981). This distinction between the case at bench and *Ybarra* and *Hobart* is immaterial; officers must have reasonable fear for their safety before frisking anyone.

## YBARRA

*Ybarra* circumscribes the situation when a police officer may make a protective frisk. *Ybarra* holds that the constitution does not permit officers who are executing a search

warrant to make a cursory search of those found at the premises. Before such a person is frisked for weapons the officer must have a reasonable belief or suspicion that that particular person is armed and dangerous. *Ybarra v. Illinois, supra; see State v. Allen,* 93 Wn.2d 170, 172, 606 P.2d 1235 (1980). The record is silent as to any reasonable belief or suspicion that the searching officer may have had that Thompson was armed and presented a danger, and therefore initiation of the frisk was improper.

### HOBART

Even if we assume, as did the court in *Hobart,* that initiation of the search were justifiable, the frisk went beyond the permissible scope. In *Hobart* the scope of the search was not strictly limited to a search for weapons but for narcotics. Similarly here the officer assumed that Thompson was under arrest and therefore undertook to search Thompson for narcotics. In *Hobart* at page 446 the Supreme Court said:

> [F]rom his own description of the search which he made, it is evident that its scope was not strictly limited to a search for weapons, but included also an exploration of the possibility that the defendant might be in possession of narcotics. Having discovered "spongy" objects (which would not reasonably be feared as dangerous weapons) in the defendant's pockets, the officer squeezed them, with the obvious purpose of ascertaining whether they had the shape and consistency of balloons commonly used for narcotics. Such a search reaches beyond the scope permitted under the Fourth Amendment, adding to the search for weapons a search for evidence of a crime.

I do not apprehend any factual distinctions between this case and *Hobart* which would justify a different result from that in *Hobart.* The majority opinion cannot be reconciled with *Hobart.* The evidence was seized in violation of the Fourth Amendment and article 1, section 7 of the state

constitution and should be suppressed.

Reconsideration denied June 26, 1981.

Review granted by Supreme Court October 16, 1981.