[No. 47976-3. En Banc. December 2, 1982.]

THE STATE OF WASHINGTON, *Respondent,* v. CLIFTON BROADNAX, JR., ET AL, *Defendants,* STEVEN ARTHUR THOMPSON, *Petitioner.*

Rebecca M. Baker, for petitioner.

Norm Maleng, Prosecuting Attorney, J. Robin Hunt, Senior Deputy, and Margaret Doyle Fitzpatrick and James B. Lobsenz, Deputies, for respondent.

WILLIAMS, J.—Petitioner, Steven Arthur Thompson, was charged with possession of heroin, a violation of the Uniform Controlled Substances Act, RCW 69.50. The trial court judge denied petitioner's motion to suppress the evidence and found him guilty. Petitioner's appeal to the Court of Appeals, Division One, resulted in an affirmance of the conviction by a 2–to–1 vote. State v. Broadnax, 25 Wn. App. 704, 612 P.2d 391 (1980). On October 10, 1980, Department Two of this court considered Thompson's first petition for review and remanded the case "for Decision in light of State v. Hobart [94 Wn.2d 437, 617 P.2d 429 (1980)]." Notation Order remanding cause to Court of Appeals, October 10, 1980. State v. Broadnax, 94 Wn.2d 1016 (1980). The Court of Appeals reaffirmed its original decision, again by a 2–to–1 vote, by attempting to distinguish our decision in Hobart. State v. Broadnax, 29 Wn. App. 443, 628 P.2d 1332 (1981). Petitioner filed a second petition for review with this court, which we accepted. Since we find the evidence should have been suppressed, we reverse the Court of Appeals and vacate petitioner's conviction.

On October 28, 1977, Detective Frank Roesler of the Seattle Police Department Narcotics Unit obtained a search warrant for the premises at 6539 Third Avenue Northwest in Seattle. The warrant named no persons, but in his affidavit Detective Roesler stated that he had been informed that within the previous 24 hours, narcotics had been offered for sale by a "male known as Clifford . . . who resides at the above address." Exhibit 1. Four police officers went to the residence to conduct the search. One of the officers, Detective Richard Buckland, Jr., was posted to

guard the back door while the other three entered through the front door. Detective Buckland had not read the warrant or supporting affidavit, and knew only that they were looking for narcotics.

Clifton Broadnax, the occupant of the house and apparently the "Clifford" referred to in the affidavit, answered the door. Once inside the house, the officers encountered petitioner, as well as a teen–age woman and a small child, in the living room. Detective Roesler instructed Broadnax and petitioner each to put their hands on their heads. The two men complied.

After about 30 seconds outside the rear of the building, Detective Buckland observed the other officers inside the house. He returned to the front door of the dwelling and entered. Detective Buckland saw Sergeant Charles Scheuffele in the living room with the infant, the woman, Broadnax, and petitioner. Broadnax and the petitioner were standing with their hands on their heads. Detective Buckland asked Sergeant Scheuffele, "Would you like him [Thompson] to be searched?" He received an affirmative response and began to search petitioner's person. Report of Proceedings, at 5.

Sergeant Scheuffele testified: "Buckland asked me if Thompson had been searched and I took that to mean frisked and I answered that he hadn't because he hadn't." Report of Proceedings, at 23–24. Detective Buckland, on the other hand, assumed petitioner was already under arrest. He testified on cross examination:

> Q: . . . Now, when you searched Mr. Thompson [petitioner] . . ., to your knowledge no narcotics had been found. Is that correct? A: That's correct. Well, excuse me. If I may back up on that. I presumed something was found because when I entered I presumed that the defendant was under arrest. Q: And then later on you found no one was under arrest. Is that correct? A: That's correct.

Report of Proceedings, at 10–11. Neither Sergeant Scheuffele nor Detective Buckland indicated any fears that peti-

tioner might be armed with a weapon. In fact, Sergeant Scheuffele twice stated that he saw no reason to do a "pat-down" for weapons "[a]s long as we could see their hands". Report of Proceedings, at 21.

During Detective Buckland's initial cursory search of petitioner's body, he felt a small bulge in petitioner's shirt pocket. He testified repeatedly that it did not feel like a gun or other weapon:

Q: You didn't have any belief at all it was a weapon?
A: No, I didn't believe it was a weapon, that's correct.

Report of Proceedings, at 11. Nevertheless, Detective Buckland then reached into petitioner's pocket and removed a balloon containing ".1 gram of brown powder containing heroin." Clerk's Papers, at 5. Shortly thereafter, Detective Roesler returned to the living room with Beotis Lashley, whom he had found in the bedroom near a quantity of controlled substances discovered in plain view. He ordered that everyone be placed under arrest.

Petitioner contends the evidence seized from his person should have been suppressed because the search violated his constitutional right to be free from unreasonable searches and seizures.[1] We agree.

■ The general rule is that an official "seizure" of a person must be supported by probable cause, even if no formal arrest is made. *Dunaway v. New York*, 442 U.S. 200, 208, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979). Those cases authorizing seizures of persons on lesser cause are narrowly drawn and carefully circumscribed. *See Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. White*, 97 Wn.2d 92, 640 P.2d 1061 (1982). Specifically, *Terry* permits an officer to briefly detain, for limited questioning, a person whom he reasonably suspects of criminal

---

[1]The fourth amendment to the United States Constitution provides, in part:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ."

Const. art. 1, § 7 provides:

"No person shall be disturbed in his private affairs, or his home invaded, without authority of law."

activity and to frisk the person for weapons if he has reasonable grounds to believe the person to be armed and presently dangerous. *Terry v. Ohio, supra; State v. Hobart,* 94 Wn.2d 437, 441, 617 P.2d 429 (1980).

The narrow scope of the *Terry* "stop–and–frisk" exception is emphasized in the companion case of *Sibron v. New York,* 392 U.S. 40, 20 L. Ed. 2d 917, 88 S. Ct. 1889 (1968), a case remarkably similar to the present case in its facts. In *Sibron,* an officer had thrust his hand into the pocket of a person suspected of possessing narcotics. In ruling that the evidence should have been suppressed, the Court stated that before an officer places a hand on the person of a citizen in search of anything,

> he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self–protective search for weapons, *he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous.*

(Citation omitted. Italics ours.) *Sibron,* at 64. Moreover, the scope of a search for weapons was expressly limited to a patting of the outer clothing of the suspect for concealed objects capable of use as instruments of assault. The Supreme Court went on to conclude:

> In this case, with no attempt at an initial limited exploration for arms, [the officer] thrust his hand into Sibron's pocket and took from him envelopes of heroin. *His testimony shows that he was looking for narcotics, and he found them. The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man.* Such a search violates the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents.

(Italics ours.) *Sibron,* at 65–66.

In *Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), the Court determined that even if an individual is found at a place where the police are author-

ized to search by a valid search warrant, the individual may only be patted down for weapons if *Terry*'s requirement of "reasonable suspicion" is satisfied. In that case, Ybarra was a patron of a public tavern who was subjected to a pat–down frisk during the execution of a search warrant authorizing a search of the premises and the bartender. After an initial patdown, the police officers returned to Ybarra and removed a cigarette pack from his pocket which was found later to contain tinfoil packets of heroin. The Supreme Court held that the evidence should be suppressed because the patdown was unjustified:

> The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons. . . .
> . . . The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.

(Footnotes and citations omitted.) *Ybarra*, at 92–94. The Court refused to permit the search of individuals, other than the bartender, simply by virtue of their "mere presence" on the premises, noting that

> a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.

*Ybarra*, at 91. *See also United States v. Di Re*, 332 U.S. 581, 583–87, 92 L. Ed. 210, 68 S. Ct. 222 (1948).

*Ybarra* is controlling here. The officers testified that petitioner obeyed the instruction to put his hands on his head. They mentioned no facts indicating a reasonable belief or suspicion that petitioner was armed or presently dangerous. Petitioner's "mere presence" at a private residence being searched pursuant to a search warrant cannot justify a frisk of petitioner's person under *Ybarra*.

The Court of Appeals attempted to distinguish *Ybarra* because it involved a search at a public tavern, whereas this

case involves a search at a private residence where narcotics had probably been sold within the preceding 24 hours. *State v. Broadnax,* 25 Wn. App. 704, 707, 612 P.2d 391 (1980). As pointed out by dissenting Judge Ringold, the private versus public distinction is fallacious and ignores the real teachings of *Ybarra. Broadnax,* 25 Wn. App. at 715–17 (Ringold, J., dissenting). Regardless of the setting, *Ybarra* states that "constitutional protections [are] possessed *individually*". (Italics ours.) *Ybarra,* at 92. Therefore, a reasonable suspicion that a person is armed and dangerous must exist as to each individual to be frisked. Merely associating with a person suspected of criminal activity does not strip away the protections of the fourth amendment to the United States Constitution. Since the officers had no fear that petitioner was armed and had nothing to independently connect petitioner to the suspected illegal activity in the house, the detention and search of his person were not "reasonable" under the Fourth Amendment or Const. art. 1, § 7.

 Even assuming arguendo that the patdown of petitioner was justifiable, the scope of the search was impermissible. In *Ybarra,* the Court reiterated that "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." *Ybarra,* at 93–94. We have recognized this limitation on a number of occasions involving the discovery of narcotics during a patdown. In *State v. Hobart, supra* at page 447, we stated:

> We are aware of no instance in which the [United States] Supreme Court has condoned the use of a "frisk" to search for evidence of an independent crime. All of its pronouncements have made it clear that such a warrantless personal intrusion is justified only to assure the safety of the officer and others.

(Footnote omitted.) This rule was stated even more emphatically in *State v. Allen,* 93 Wn.2d 170, 172–73, 606 P.2d 1235 (1980):

> Assuming the legality of the frisk, the discovery of an

unidentified "bulge" in the course of the patdown would entitle the officer to assure himself that it was not a weapon. After satisfying himself the "bulge" was not a weapon, the officer had no valid reason to further invade Allen's right to be free of police intrusion absent reasonable cause to arrest. . . .

. . .

. . . *[O]nce it is ascertained that no weapon is involved, the government's limited authority to invade the individual's right to be free of police intrusion is spent.*

(Citations omitted. Italics ours.) Most recently, in *State v. Loewen,* 97 Wn.2d 562, 567, 647 P.2d 489 (1982), we held that a warrantless search not incident to a lawful arrest must be "confined in scope to an intrusion designed to discover weapons and not drug paraphernalia."

In the case now before us, Detective Buckland testified that when he felt the object inside Thompson's pocket, he did not believe it was a weapon. Instead, he felt what he termed "a small bulge that . . . gives" and believed it to be a balloon of heroin. Report of Proceedings, at 7. Detective Buckland's testimony shows he was looking for narcotics, and he found them. The search was not reasonably limited to the only purpose which could have justified its inception, namely, a patdown for weapons. The intensity of the search was constitutionally impermissible absent probable cause to arrest. *See Sibron v. New York, supra* at 65–66.

Next, we turn to the question of whether probable cause existed to justify petitioner's arrest. If probable cause did exist, the search could be justified as a search incident to a lawful arrest. *Chimel v. California,* 395 U.S. 752, 763, 23 L. Ed. 2d 685, 89 S. Ct. 2034 (1969). We find, however, that there was no probable cause to arrest petitioner under the circumstances of this case.

In its first opinion in this case, the Court of Appeals believed probable cause existed to search and arrest petitioner. Based on the initially erroneous assumption that the frisk of petitioner was permissible, the court concluded probable cause to arrest arose when Detective Buckland felt

the bulge in petitioner's pocket and "recognized" it as a balloon containing heroin:

> Logically, there is no difference in power of recognition between use of the tactile rather than the visual sense. An object may be perceived by touch equally as well as by sight.

*Broadnax,* 25 Wn. App. at 708. The majority opinion went on to equate this situation with cases where the odor of marijuana has been held sufficient to create probable cause to search and arrest, *see Johnson v. United States,* 333 U.S. 10, 92 L. Ed. 436, 68 S. Ct. 367 (1948); *State v. Hammond,* 24 Wn. App. 596, 603 P.2d 377 (1979), and with cases employing the plain view doctrine. *Broadnax,* 25 Wn. App. at 708. We find fault with this entire line of reasoning.

█ The "plain view" doctrine has three requirements: (1) a prior justification for the intrusion; (2) an inadvertent discovery of incriminating evidence; and (3) immediate knowledge by police that they have evidence before them. *State v. Murray,* 84 Wn.2d 527, 534, 527 P.2d 1303 (1974). It has already been established above that the first requirement, a prior justification for the intrusion, was lacking here. In addition, the third requirement is not met if the sense of touch is relied upon exclusively for the recognition of contraband. The tactile sense does not usually result in the *immediate* knowledge of the nature of the item. The officer in this case could not know the bulge was a balloon containing heroin. His observations lacked "the distinctive character of the smell of marijuana or the hardness of a weapon." *Broadnax,* 25 Wn. App. at 718 (Ringold, J., dissenting). A soft bulge in a shirt pocket is not alone sufficient information to find probable cause to arrest.

More importantly, to "recognize" an object through the tactile sense is in itself a search requiring probable cause. Whereas the detection of evidence by sight or smell can be accomplished without the physical intrusion of one's person, this is not so with respect to evidence discovered by touch. Evidence seen or smelled *prior* to any physical intrusion may establish probable cause to arrest and search

an individual. By contrast, one cannot search first to gather evidence to establish the probable cause needed to justify the initial intrusion. Otherwise, the requirement of probable cause to arrest would be turned upside down.

In *Hobart,* we squarely addressed the same issue presented here. During a pat–down frisk for weapons, two "spongy objects" in Hobart's pocket were detected by the officer. Although he had no reasonable fear the objects were weapons, the officer squeezed them and thereafter concluded they were balloons containing narcotics. We held this search to be beyond the scope of the Fourth Amendment because frisks for weapons cannot be expanded to search for evidence of an independent crime.

> *To approve the use of evidence of some offense unrelated to weapons would be to invite the use of weapons' searches as a pretext for unwarranted searches,* and thus to severely erode the protection of the Fourth Amendment. Such a step this court is not prepared to take.

(Italics ours.) *State v. Hobart,* 94 Wn.2d 437, 447, 617 P.2d 429 (1980). The case now before us is factually and legally indistinguishable from *Hobart.*[2] In its finding of fact 7, the trial court specifically found "[t]hat Detective Buckland did not personally believe the defendant [Thompson] possessed a weapon at the time of the search." Clerk's Papers, at 7. Nevertheless, he conducted the search under the mistaken

---

[2]The specific facts surrounding the seizure of evidence from petitioner are as follows:

When Detective Buckland commenced the "frisk" of petitioner, he began with the belt area. During this initial search he felt a small bulge in petitioner's shirt pocket. He then began a more complete search. He believed he took petitioner's wallet out of his back pocket. He then "went back up . . . back up to where I felt something in the pocket. It didn't feel like a gun or weapon to me." Report of Proceedings, at 7. Buckland testified that what he found was "[a] small bulge that has a—it gives." Report of Proceedings, at 7. He stated that he recognized the object as something similar to other objects he had found to be balloons of heroin or some other substance. He then reached into petitioner's pocket and found a balloon containing what later proved to be heroin, along with $55 in cash. Buckland stated at least twice more on cross examination that the bulge did not feel like a gun or weapon and he did not think it was one.

impression that petitioner was under arrest. As such, his search was for narcotics—not merely a patdown for weapons. Without a reasonable belief or suspicion that petitioner was armed, Detective Buckland had no valid reason to explore further. The impermissible seizure of the evidence may not serve as probable cause to justify the initial intrusion of petitioner's person. We will not approve the use of evidence of an independent crime unrelated to the initial intrusion to explore for weapons. *State v. Hobart, supra.*

■ The discovery of controlled substances in the bedroom of the residence similarly cannot serve to establish probable cause to arrest or search petitioner. That evidence was found after the search of petitioner had already been completed and thus could not form the basis for the initial intrusion of petitioner's right of privacy. In *Michigan v. Summers,* 452 U.S. 692, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981), the Court did permit officers executing a residential search warrant to *detain* the *occupant* of the home while the search was completed. The basis for that limited intrusion was that

> [t]he connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

*Summers,* at 703–04. Thus, an occupant's constructive control over the premises which is the subject of a search warrant provides a sufficient connection with the suspected illegal activities to permit a detention of that individual. A footnote in *Summers,* however, suggests that while occupants of private residences may be "seized" while a proper search of the premises is conducted, any search of those occupants or others on the premises must meet the standards of *Ybarra. Summers,* at 695 n.4.

When *Summers* is read in conjunction with *Ybarra,* it becomes clear that persons not directly associated with the premises and not named in the warrant cannot be detained or searched without some independent factors tying those

persons to the illegal activities being investigated. In other words, "mere presence" is not enough; there must be "presence plus" to justify the detention or search of an individual, other than an occupant, at the scene of a valid execution of a search warrant. *See generally* Carr, *Michigan v. Summers: Detentions Permitted While Search Warrant Is Executed,* 8 Search & Seizure L. Rep. 115–19 (1981). It is well established that a warrant authorizing the search of a premises does not also extend to authorize the *search* of an individual found on the premises. *Tacoma v. Mundell,* 6 Wn. App. 673, 495 P.2d 682 (1972).

In *Ybarra,* the Supreme Court's holding had a twofold impact on the "mere presence" doctrine. First, the Court held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra,* at 91; *State v. Thompson,* 93 Wn.2d 838, 841, 613 P.2d 525 (1980). Second, the Court clearly rejected any argument that would allow searches of persons found on "compact premises" merely because those premises are being searched, pursuant to a warrant, for drugs. *Ybarra,* at 95. A footnote in *Ybarra* specifically relates the Court's holding to searches of private residences, as in the present case. *Ybarra,* at 95 n.9.

Cases from other jurisdictions apply *Ybarra* to searches of private residences, some having fact patterns very similar to the facts before us. *See, e.g., United States v. Clay,* 640 F.2d 157 (8th Cir. 1981); *United States v. Cole,* 628 F.2d 897 (5th Cir. 1980); *State v. Harrison,* 95 N.M. 383, 622 P.2d 288 (1980) (motel room). Additionally, recent Supreme Court decisions have again recognized that the zone of privacy is more clearly defined when bounded by the physical dimensions of an individual's home—"a zone that finds its roots in clear and specific constitutional terms . . ." *Payton v. New York,* 445 U.S. 573, 589, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980). *See also Steagald v. United States,* 451 U.S. 204, 68 L. Ed. 2d 38, 101 S. Ct. 1642 (1981).

A person's mere presence at the scene of suspected criminal activity does not entitle police officers to search that individual. Neither may the police seize an individual, other than an occupant of the premises, so as to make him available in case probable cause is later developed to arrest him. As described by one court:

> The "mere presence" doctrine seeks to protect persons innocently in the company of a known or suspected criminal. *Therefore, some additional circumstance from which it is reasonable to infer knowledge of or participation in criminal enterprise must be shown.*

(Italics ours.) *United States v. Vilhotti,* 323 F. Supp. 425, 432 (S.D.N.Y. 1971). Any other conclusion would contravene the protections of the Fourth Amendment and Const. art. 1, § 7.

█ Finally, despite the discovery of controlled substances in the bedroom of Broadnax's home, that evidence did not establish probable cause to arrest petitioner. Under the reasoning of *Summers,* the discovery of evidence in the bedroom would create probable cause to arrest Broadnax himself, because his constructive control over the premises is sufficient to connect him to illegal activities occurring therein. As to other individuals on the premises, however, there must be shown additional factors connecting them to the illegal activity to establish probable cause. In *Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979), the State of Illinois argued to the United States Supreme Court that since the evidence of a narcotics possession may be concealed or moved around from person to person, the *Terry* "reasonable belief or suspicion" standard should be made applicable to aid the evidence–gathering function of the search warrant. *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

> More precisely, we are asked to construe the Fourth and Fourteenth Amendments to permit evidence searches of persons who, at the commencement of the search, are on "compact" premises subject to a search warrant, *at least where the police have a "reasonable belief" that such persons "are connected with" drug trafficking and "may*

*be concealing or carrying away the contraband."*
(Italics ours.) *Ybarra,* at 94. After noting that the Court
had rejected a similar argument over 30 years ago in
*United States v. Di Re,* 332 U.S. 581, 583–87, 92 L. Ed. 210,
68 S. Ct. 222 (1948), the Court again rejected this proposal
and adhered to the principle that individualized probable
cause is a prerequisite to an evidence search of any person
on the premises:

> The "long–prevailing" constitutional standard of prob-
> able cause embodies "'the best compromise that has been
> found for accommodating [the] often opposing interests'
> in 'safeguard[ing]' citizens from rash and unreasonable
> interferences with privacy' and in 'seek[ing] to give fair
> leeway for enforcing the law in the community's protec-
> tion.'"

(Footnote omitted.) *Ybarra,* at 95–96, quoting from *Dun-
away v. New York,* 442 U.S. 200, 208, 60 L. Ed. 2d 824, 99
S. Ct. 2248 (1979) and *Brinegar v. United States,* 338 U.S.
160, 176, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949).

Unlike Broadnax, petitioner had no constructive control
over the premises as a mere visitor. There were no facts
indicating petitioner's knowledge of the drugs in the bed-
room. In short, there appears to be nothing to directly
relate petitioner to the drugs found in the bedroom other
than his "mere presence" within the house. The above
quoted language from *Ybarra* makes it clear that even
though petitioner was present in a place where the police
had a "reasonable belief" that drug trafficking was occur-
ring and that persons on the premises "may be concealing
or carrying away the contraband", such beliefs cannot be
equated with the individualized probable cause necessary to
justify an arrest and search incident thereto.

In this case, when Detective Roesler returned from find-
ing the drugs in the bedroom and announced that everyone
should be placed under arrest, the officers arrested every-
one present without a particularized showing of probable
cause to do so. This clearly contravenes the protections of
the Fourth Amendment that probable cause be required to

arrest. *See Dunaway v. New York, supra.* Absent some independent factors tying petitioner to the illegal activities on the premises, it was no more likely that he was engaged in the criminal enterprise than that he was an innocent visitor on the premises. *See United States v. Vilhotti, supra.* The discovery of contraband during the execution of a search warrant does not alone establish probable cause to arrest all persons present.

To summarize, we conclude that: (1) Since the officers had no reasonable belief or suspicion that petitioner was armed or presently dangerous, the pat–down frisk of petitioner violated his personal rights of privacy; (2) even if a patdown for weapons was justified, the officer exceeded the permissible scope of the intrusion when the search went beyond ascertaining whether petitioner was armed; (3) since the evidence in petitioner's pocket was seized during an illegal search, it cannot serve as the basis for probable cause to arrest; (4) while an occupant may be detained during the execution of a residential search warrant, this limited exception to the probable cause requirement does not extend to those merely present on the premises; and (5) the discovery of evidence of criminal activity during the execution of a search warrant does not, without more, establish probable cause to arrest all persons present. For the foregoing reasons, we hold the search and arrest of petitioner violated both the Fourth Amendment and Const. art. 1, § 7. We reverse the courts below, suppress the evidence, and vacate petitioner's conviction.

ROSELLINI, STAFFORD, UTTER, and DORE, JJ., concur.

DOLLIVER, J. (dissenting)—The only issue in this case is whether, after the discovery of the controlled substance in the bedroom, the police had probable cause to arrest the defendant Thompson. If the arrest was constitutionally permissible, then the widely accepted inevitable discovery exception to constitutional evidentiary rules, also known as the hypothetical independent source rule, should be

applied. *See Somer v. United States,* 138 F.2d 790 (2d Cir. 1943); *State v. Williams,* 285 N.W.2d 248 (Iowa 1979). *See also* 3 W. LaFave, *Search and Seizure* § 11.4, at 620–28 (1978); LaCount & Girese, *"The Inevitable Discovery" Rule, an Evolving Exception to the Constitutional Exclusionary Rule,* 40 Alb. L. Rev. 483 (1976); Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules,* 74 Colum. L. Rev. 88 (1974).

It is my belief this case meets all of the criteria for the application of the inevitable discovery rule. The majority, however, contends this is a case which falls under the principles expressed in *Ybarra v. Illinois,* 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979). *Ybarra* is not in point. Here are the facts in that case as set forth by the Supreme Court:

On March 1, 1976, a special agent of the Illinois Bureau of Investigation presented a "Complaint for Search Warrant" to a judge of an Illinois Circuit Court. The complaint recited that the agent had spoken with an informant known to the police to be reliable and:

"3. The informant related . . . that over the weekend of 28 and 29 February he was in the [Aurora Tap Tavern, located in the city of Aurora, Ill.] and observed fifteen to twenty–five tin–foil packets on the person of the bartender 'Greg' and behind the bar. He also has been in the tavern on at least ten other occasions and has observed tin–foil packets on 'Greg' and in a drawer behind the bar. The informant has used heroin in the past and knows that tin–foil packets are a common method of packaging heroin.

"4. The informant advised . . . that over the weekend of 28 and 29 February he had a conversation with 'Greg' and was advised that 'Greg' would have heroin for sale on Monday, March 1, 1976. This conversation took place in the tavern described."

On the strength of this complaint, the judge issued a warrant authorizing the search of "the following person or place: . . . [T]he Aurora Tap Tavern. . . . Also the person of 'Greg', the bartender, a male white with blondish hair appx. 25 years." The warrant authorized the police to search for "evidence of the offense of possession of a controlled substance," to wit, "[h]eroin, contraband, other controlled substances, money, instrumentalities

and narcotics, paraphernalia used in the manufacture, processing and distribution of controlled substances."

In the late afternoon of that day, seven or eight officers proceeded to the tavern. Upon entering it, the officers announced their purpose and advised all those present that they were going to conduct a "cursory search for weapons." One of the officers then proceeded to pat down each of the 9 to 13 customers present in the tavern, while the remaining officers engaged in an extensive search of the premises.

The police officer who frisked the patrons found the appellant, Ventura Ybarra, in front of the bar standing by a pinball machine. In his first patdown of Ybarra, the officer felt what he described as "a cigarette pack with objects in it." He did not remove this pack from Ybarra's pocket. Instead, he moved on and proceeded to pat down other customers. After completing this process the officer returned to Ybarra and frisked him once again. This second search of Ybarra took place approximately 2 to 10 minutes after the first. The officer relocated and retrieved the cigarette pack from Ybarra's pants pocket. Inside the pack he found six tinfoil packets containing a brown powdery substance which later turned out to be heroin.

*Ybarra,* 444 U.S. at 87–89. The Court stated in *Ybarra*

a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.

444 U.S. at 91. I agree. Neither would "mere propinquity" give rise to probable cause to arrest, nor is this a case where the court is

asked to construe the Fourth and Fourteenth Amendments to permit evidence searches of persons who, at the commencement of the search, are on "compact" premises subject to a search warrant, at least where the police have a "reasonable belief" that such persons "are connected with" drug trafficking and "may be concealing or carrying away the contraband."

444 U.S. at 94.

There were two ingredients not present in *Ybarra* which are the additional "independent factors" present in this case. First, in *Ybarra* the affidavit for the warrant did not

say the bar premises were used for drug trafficking. *Ybarra,* at 90. In contrast, the affidavit here specifically states drug trafficking had occurred on the premises within the past 24 hours. Second, here the contraband which was the subject of the search was indeed found. No such discovery was made in *Ybarra* or in *United States v. Di Re,* 332 U.S. 581, 92 L. Ed. 210, 68 S. Ct. 222 (1948), relied upon so heavily by the Supreme Court and the majority.

Thus in this case we have "presence" *plus* a validly executed search warrant to enter premises where drug trafficking was suspected *and* the subsequent discovery of the contraband in plain view in a bedroom of the house.

Given these circumstances, to hold Thompson was not subject to arrest is to make one wonder what, if any, additional "independent factors" would prompt the majority to find probable cause for arrest. The Supreme Court recently held one leaving a house as the police were entering to execute a valid warrant to search the house for narcotics could be lawfully required "to remain in the house until evidence establishing probable cause to arrest him was found, his arrest and the search incident thereto were constitutionally permissible." *Michigan v. Summers,* 452 U.S. 692, 705, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981). The majority points to a footnote in *Summers,* at 695 n.4, which it says "suggests that while occupants of private residences may be 'seized' while a proper search of the premises is conducted, any search of those occupants or others on the premises must meet the standards of *Ybarra.*" Majority, at 300. From this the majority goes on to state:

> Finally, despite the discovery of controlled substances in the bedroom of Broadnax's home, that evidence did not establish probable cause to arrest petitioner. Under the reasoning of *Summers,* the discovery of evidence in the bedroom would create probable cause to arrest Broadnax himself, because his constructive control over the premises is sufficient to connect him to illegal activities occurring therein. As to other individuals on the premises, however, there must be shown additional factors connecting them to the illegal activity to establish

probable cause.

Majority, at 302.

Neither *Summers* nor the reasoning in *Summers* leads to this conclusion nor is this the rule in *Summers*. Furthermore, the majority in suggesting illegal activities were occurring in *Ybarra* errs in the facts. *No illegal activity of any kind* is shown by the facts in *Ybarra*. The only contraband found was that on the person of Ybarra himself. In contrast, both in *Summers* and in this case contraband was discovered on the premises in plain view. Criminal activity was not merely suspected in this case; with the discovery of the contraband it became a fact. A warrant which states drug trafficking is occurring plus the discovery of contraband surely ought to be sufficient probable cause to justify an arrest.

I believe the arrest of Thompson was constitutionally permissible. Nonetheless, the majority argues the search itself was conducted and the "evidence was found after the search of petitioner had already been completed and thus could not form the basis for the initial intrusion of petitioner's right of privacy." Majority, at 300. This being the case, the "discovery of controlled substances in the bedroom of the residence . . . cannot serve to establish probable cause to arrest . . . petitioner." Majority, at 300. The approach of the majority ignores the widely accepted inevitable discovery exception. Given the time which elapsed between the patdown of defendant and discovery of heroin by Detective Buckland and when Detective Roesler having just discovered contraband in the bedroom directed that everyone should be placed under arrest—"5 or 10 seconds" in the uncontradicted testimony—I believe this is a case where the inevitable discovery exception should be applied.

The inevitable discovery rule provides that evidence tainted by illegality will not be suppressed when

the prosecution [can] show that the evidence in question "would have" been discovered, absent the illegality, by proper and predictable investigatory procedures. This broad statement of the rule may be further divided into a

two–part test. Before a court will invoke the rule the prosecution must establish, first, that certain proper and predictable investigatory procedures would have been utilized in the case at bar, and second, that those procedures would have inevitably resulted in the discovery of the evidence in question.

LaCount & Girese, 40 Alb. L. Rev. at 491. Some courts add a third requirement that "use of the doctrine should be permitted only when the police have not acted in bad faith to accelerate the discovery of the evidence in question." *State v. Williams,* 285 N.W.2d 248, 258 (Iowa 1979). While I agree with the need for this additional requirement, I believe there must be an affirmative showing the police did not act unreasonably rather than that they did not act in "bad faith". *See Terry v. Ohio,* 392 U.S. 1, 21–22, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

The court should adopt the inevitable discovery rule by which tainted evidence can be admitted if the following criteria are met:

(1) The police did not act unreasonably or to accelerate the discovery of the evidence in question; (2) proper and predictable investigatory procedures would have been utilized; and (3) those procedures would have inevitably resulted in the discovery of the evidence in question. For all three criteria, the burden of proof is on the State.

All of the requirements of the rule have been met. Given the circumstances of the case—the search of a residence where heroin had allegedly been sold within the past 24 hours—and the situation in which Detective Buckland found defendant, and given Buckland's experience as a narcotics officer, it was not unreasonable for him to presume defendant was under arrest and, being under arrest, that a full search of his person was proper. *See United States v. Robinson,* 414 U.S. 218, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973); *Gustafson v. Florida,* 414 U.S. 260, 38 L. Ed. 2d 456, 94 S. Ct. 488 (1973). No unreasonable action—indeed, no action at all—was taken by the police to accelerate the search.

As to the second part of the test, the police were in the house under a valid warrant to search for illegal drugs. It is proper and predictable under these circumstances that the drugs in the bedroom would be found, that defendant would be arrested and searched, and the heroin discovered. The entire procedure was proper and predictable.

The third test is easily met. The reasonable procedures which would have resulted because of the discovery of the controlled substances in the bedroom also would have inevitably led to discovery of the heroin, had a momentary delay—5 to 10 seconds—occurred in the search of defendant by Buckland. By this time the contraband would have been discovered in the bedroom and defendant would have properly been under arrest.

The evidence of the heroin found on the person of defendant should be admitted. I agree that "In carving out the 'inevitable discovery' exception to the taint doctrine, courts must use a surgeon's scalpel and not a meat axe." 3 W. LaFave, *Search and Seizure* § 11.4, at 624. *See State v. Williams, supra.* I also agree that if high standards are maintained for the application of the rule it

can be applied by the courts in a way that can protect the law enforcement interests of society while providing substantial deterrence of official misconduct and thus protecting the individual rights of criminal suspects.

Note, 74 Colum. L. Rev. at 103. In my opinion these desirable ends are met in this case.

I dissent.

BRACHTENBACH, C.J., and DIMMICK, J., concur with DOLLIVER, J.