Opinión disidente emitida por la
Juez Asociada Señora Ro-dríguez Rodríguez,
a la que se unen el Juez Presidente Señor Hernández Denton y la Jueza Asociada Señora Fiol Matta.
And, in order to be exercised, this power had to be given the instrument of permanent, exhaustive, omnipresent surveillance, capable of making all visible, as long as it could itself remain invisible.(1)
Disiento enérgicamente de la determinación que hoy anuncia este Tribunal por entender que lejos de impartirle un contenido más abarcador a los derechos que establece nuestra Constitución, la mayoría opta por incorporar inne-cesariamente a nuestra jurisdicción la doctrina de eviden-cia obtenida mediante el tacto para validar un registro sin una orden judicial. Peor aún, al aplicar los criterios de esta doctrina, la mayoría limita los derechos de los ciudadanos *949 más allá del ámbito mínimo de protección establecido por la jurisprudencia federal en aras de validar el registro. Al así proceder, olvidan que “there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all”. Arizona v. Hicks, 480 US 321, 329 (1987).
I
El 5 de octubre de 2011 el Ministerio Público presentó una denuncia contra el señor Octavio Báez López por vio-lación al Art. 5.04 de la Ley de Armas de Puerto Rico, Ley Núm. 404 de 11 de septiembre de 2000, 25 LPRA sec. 458c. Específicamente, se le imputó que para el 30 de mayo de 2011, el señor Báez López portaba ilegalmente una pistola Smith & Wesson negra, calibre .40mm, modelo XDM-40, cargada con una munición en recámara y quince muni-ciones.
Luego de la lectura de acusación, el señor Báez López presentó una moción de supresión del arma de fuego incautada. En síntesis, alegó que conforme al testimonio de la agente Michaida Rivera Alvarado en la vista preliminar, la incautación del arma de fuego se realizó en violación a la protección constitucional contra registros y allanamientos irrazonables. Sostuvo que, conforme a los hechos narrados por ésta, procedía suprimir el arma de fuego incautada. Según relató la agente Rivera Alvarado, los hechos que die-ron base para incautar el arma fueron los siguientes.
El 30 de mayo de 2011 la agente Rivera Alvarado escu-chó por la radiocomunicación de la Policía sobre la ocurren-cia de un accidente de motora en la carretera interestatal 174. En ese momento se dirigió al lugar del accidente. Al arribar al lugar, ésta observó a un joven que yacía en el pavimento cerca de una motora accidentada. El joven san-graba por la cabeza, manos y piernas. Describió el estado del joven como aturdido y medio inconsciente. No obstante, *950 no cuestionó al joven para identificarlo o para conocer si le afectaba alguna condición.
Minutos después, los paramédicos arribaron a la escena y ofrecieron los primeros auxilios al joven. Para proceder a prestarle los servicios médicos, el paramédico le removió al joven una cartera color negra que éste llevaba transversal-mente en el pecho. Acto seguido, debido a que en ese mo-mento no se encontraba ningún familiar del joven en la escena, el paramédico procedió a entregar la cartera a la agente Rivera Alvarado. Cuando ésta recibió la cartera, palpó lo que aparentaba ser un arma de fuego y, sin pedirle autorización al joven, procedió a abrirla. Al abrir la car-tera, se percató de que en ésta había un arma de fuego y extrajo lo que resultó ser una pistola Smith & Wesson. Pos-teriormente, el joven fue trasladado al hospital regional. Allí, la agente Rivera Alvarado, luego de leerle las adver-tencias legales, procedió a entrevistarlo. Cuando le cues-tionó sobre la posesión del arma, el joven aceptó que no tenía licencia para portar armas. Ello dio lugar a la acusa-ción contra el señor Báez López por portación ilegal de un arma.
Conforme a estos hechos, el señor Báez López sostuvo su alegato de supresión del arma de fuego. Adujo que la evidencia incautada no estaba a plena vista. Además, se-ñaló que, contrario a las declaraciones de la agente Mi-chaida Rivera Alvarado en su declaración jurada,(2) en la vista preliminar ésta aceptó que el registro iba dirigido a encontrar material delictivo y que no estaba vinculado a la atención de una emergencia ni a la identificación del señor Báez López. Finalmente, sostuvo que la agente no tenía una sospecha individualizada que le permitiera concluir que en el interior de la cartera se transportaba material *951 delictivo, sino que mediante el registro trató de validar una sospecha producto de una actuación ilegal.
El Ministerio Público se opuso a la supresión solicitada por el señor Báez López. Señaló que debido a que el señor Báez López estaba en peligro y necesitaba ayuda, se cum-plieron los criterios de razonabilidad reconocidos por nues-tra jurisprudencia para realizar un registro sin una orden judicial en una situación de emergencia. Además, argüyó que el señor Báez López transitaba en una motora, cuya expectativa de intimidad es menor que cuando se transita en un automóvil. Luego de la vista de supresión de eviden-cia, el 1 de febrero de 2012 el Tribunal de Primera Instan-cia declaró “con lugar” la moción de supresión de evidencia.
El foro de instancia razonó que, según el testimonio de la agente Rivera Alvarado y el paramédico Carlos Rosado Erazo en la vista de supresión, no se configuraron las cir-cunstancias para realizar un registro sin una orden judicial en una situación de emergencia. En la vista la agente aceptó que el señor Báez López no estaba inconsciente. Además, indicó que éste respondía las preguntas de los paramédicos. Sostuvo que la agente, para justificar la búsqueda en la car-tera, indicó que intentaba encontrar alguna identificación, pero en la vista aceptó que el propósito del registro fue la curiosidad de encontrar el arma de fuego. Por lo tanto, con-cluyó que si la agente hubiese tenido una sospecha fundada sobre la existencia de un arma, procedía dejar la cartera en custodia con otro agente y solicitar una orden de registro.
En desacuerdo con esta determinación, el Ministerio Pú-blico acudió ante el Tribunal de Apelaciones mediante un recurso de certiorari. En síntesis, sostuvo que erró el foro primario al suprimir la evidencia porque no hubo una orden judicial previa, esto a pesar de que se trataba de un registro válido en el cual medió una situación de emergencia. Alegó que la expectativa de intimidad de un motociclista herido es limitadísima y que el accidente justificó el registro de emer-gencia como mecanismo dirigido a identificar al herido. Esta *952 vez, sin embargo, sostuvo que aun si no hubiese mediado una situación de emergencia, procedía el registro sin una orden toda vez que el agente percibió mediante el tacto que había un objeto que aparentaba ser un arma de fuego, con lo cual la agente tenía una sospecha individualizada de que en el interior de la cartera había un arma de fuego; esto vali-daba el registro sin una orden judicial.
Mediante una Resolución emitida el 29 de marzo de 2012, el foro apelativo intermedio denegó el recurso de cer-tiorari presentado por el Ministerio Público. Razonó que, a la luz de los hechos de este caso, no se configuró una situa-ción de emergencia que permitiera el registro sin la orden judicial. Además, sostuvo que si la agente Rivera Alvarado tenía motivos fundados para creer que el señor Báez López cometía un delito en su presencia, procedía ponerlo bajo arresto antes de realizar el registro.
Inconforme, el Ministerio Público solicitó la reconside-ración ante el Tribunal de Apelaciones. Esta vez sostuvo que la agente realizó el registro partiendo de la creencia razonable de que estaba ante una situación de emergencia. Sin embargo, en la reconsideración sostuvo que es inmate-rial si hubo o no una situación de emergencia. Una vez la agente palpó un objeto que aparentaba ser un arma de fuego en el interior de la cartera, se generó una sospecha individualizada y razonable que validó el registro de la car-tera debido a que el arma es un objeto inherentemente peligroso y altamente regulado por el Estado. Sostuvo ade-más que, independientemente de la situación de emergen-cia, el descubrimiento de la pieza delictiva era inevitable ya que, como cuestión de protocolo del paramédico, éste debía preparar un recibo de propiedad, excepción al regis-tro con una orden judicial. El Tribunal de Apelaciones de-claró “no ha lugar” la solicitud de reconsideración.
En desacuerdo con la determinación del foro apelativo intermedio, el Ministerio Público acudió ante este Tribunal mediante un recurso de certiorari. Reiteró los argumentos *953 presentados en la moción de reconsideración ante el Tribunal de Apelaciones. El 4 de junio de 2012 expedimos el recurso ante nuestra consideración.
II
A
La Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico establece el derecho de todo ciudadano a la protección sobre sus casas, papeles y efectos personales contra registros, incautaciones y allanamientos irrazonables. Const. PR, Art. II, Sec. 10. El propósito de este precepto constitucional es proteger el derecho a la in-timidad de las personas y la dignidad del individuo frente a las actuaciones arbitrarias e irrazonables del Estado. Pueblo v. Yip Berríos, 142 DPR 386, 397 (1997); Pueblo v. Ramos Santos, 132 DPR 363, 370 (1992).
Esta disposición constitucional es análoga a la Enmienda IV de la Constitución de Estados Unidos. Pueblo v. Yip Berríos, supra, pág. 397. Véase, además, 3 Diario de Sesiones de la Convención Constituyente 1568 (1961); J. Trías Monge, Historia constitucional de Puerto Rico, Río Piedras, Ed. Universitaria, 1982, T. 3, pág. 191. No obs-tante, hemos reconocido que la disposición en la Constitu-ción federal solo establece el ámbito mínimo de protección, por lo que tanto los estados como Puerto Rico pueden am-pliar esta garantía constitucional con el propósito de con-ceder mayores protecciones a la ciudadanía. Pueblo v. Yip Berríos, supra, págs. 397-398.(3)
*954 Como bien reconoce una mayoría de este Tribunal, a diferencia de la Constitución federal, nuestra Constitución ex-presamente limita el uso que se le puede otorgar a una evi-dencia incautada mediante un registro irrazonable sin una orden judicial previa. Es decir, como regla general, nuestro ordenamiento requiere que se obtenga una orden judicial previo a que se realice un registro. Pueblo v. Malavé González, 120 DPR 470, 477 (1988). Consecuentemente, todo re-gistro o incautación sin una orden judicial se presume irrazonable y, por lo tanto, inválido. Pueblo v. Serrano Reyes, 176 DPR 437, 447 (2009).(4)
Para que se active la protección contra registros irrazonables lo primero que debe determinarse es si en efecto hubo un registro. Pueblo v. Bonilla, 149 DPR 318, 329 (1999). Así, hemos sostenido que “[s]e entiende que ha ocurrido un registro cuando se infringe la expectativa de intimidad que la sociedad está preparada a reconocer como razonable”. Pueblo en interés menor N.O.R., 136 DPR 949, 961-962 (1994). Esto es, el ciudadano debe albergar una expectativa de intimidad y que la sociedad esté dispuesta a aceptar que dicha expectativa es razonable. Por tal razón, hemos señalado que la protección constitucional se refiere a aquella propiedad sobre la cual la persona tenga una expectativa de intimidad y protege tanto al sospechoso u ofensor como al inocente. Pueblo v. Miranda Alvarado, 143 DPR 356, 363 (1997).
En Pueblo v. Yip Berríos, supra, pág. 399, sostuvimos que el criterio para determinar si la actuación gubernamental es constitucionalmente permisible vis a vis la expectativa de *955 intimidad del ciudadano, es la razonabilidad de la intrusión estatal con la intimidad de la persona. Añadimos que:
Esto normalmente se determina balanceando los intereses del Estado frente a los derechos individuales. El menor o mayor grado de expectativa a la intimidad que nuestro ordenamiento le reconoce a una persona en determinada circunstancia es per-tinente para el análisis acerca de la razonabilidad de la actua-ción gubernamental y en consecuencia para determinar el al-cance de la protección constitucional. En este contexto, y dado que en Puerto Rico los derechos individuales y particularmente el derecho a la intimidad y dignidad reciben una protección más amplia que en la jurisdicción federal, en nuestra jurisdicción el criterio de razonabilidad es más estricto. (Enfasis nuestro). Id., pág. 399.
B
Si bien en nuestro ordenamiento todo registro sin una orden se presume inválido, hemos reconocido excepciones limitadas y específicas a la presunción de invalidez. En Pueblo v. Miranda Alvarado, supra, pág. 363 esc. 3, validamos las excepciones siguientes:
(1) registro y allanamiento de estructuras abandonadas;
(2) registro de evidencia abandonada o arrojada por la persona;
(3) registro incidental al arresto, cuando el área registrada está al alcance inmediato del sujeto y el propósito es ocupar armas o instrumentos que puedan ser utilizados por la persona arrestada para agredir a los agentes del orden público, o para intentar una fuga o evitar la destrucción de evidencia;
(4) cuando la evidencia se encuentra a plena vista [o cuando un agente del orden público adviene en conocimiento de material delictivo por el olfato];
(5) campo abierto;
(6) cuando circunstancias de emergencia así lo requieran;
(7) registro tipo inventario, que sea realizado para salva-guardar el contenido del vehículo y proteger a la Policía así como al dueño del vehículo;
(8) cuando la evidencia es obtenida durante el transcurso de una persecución;
(9) evidencia obtenida durante un registro administrativo en una actividad altamente reglamentada por el Estado, y
*956 (10) cuando el registro es consentido directa o indirecta-mente. (Citas omitidas).(5)
En todas estas circunstancias se ha reconocido que no existe una expectativa razonable de intimidad, por ende, no hay protección constitucional que salvaguardar.
III
A
Hoy una mayoría de este Tribunal determina correcta-mente que en este caso no se configuraron los criterios para que aplique la excepción al requisito de una orden judicial cuando media una situación de emergencia. En este caso, la agente Rivera Alvarado no podía albergar la creencia razo-nable de que estaba ante una emergencia; el señor Báez López estaba consciente y podía haber sido interrogado para conocer su identidad antes de proceder a abrir la cartera. Además, en la vista preliminar la agente reconoció que la intención de abrir la cartera fue la “curiosidad” por encon-trar material delictivo y no para dar con una identificación del señor Báez López, según había sostenido en su declara-ción jurada. Coincidimos, a su vez, con la determinación de una mayoría de este Tribunal al señalar que en este caso no procedía la excepción de descubrimiento inevitable al reali-zarse un recibo de propiedad. El Estado no demostró que existiese un procedimiento rutinario que inevitablemente hubiese permitido el descubrimiento del arma de fuego incautada.
No obstante lo anterior, ausente de argumentos para sos-tener la razonabilidad de un registro que a todas luces in-cumple con las garantías mínimas consagradas en nuestra *957 Constitución, hoy una mayoría de este Tribunal adopta in-necesariamente la doctrina de evidencia incautada me-diante el sentido del tacto —“plain touch/plain feel”— reco-nocida por el Tribunal Supremo de Estados Unidos en Minnesota v. Dickerson, 508 US 366 (1993), como excepción a la presunción de ilegalidad de un registro sin una orden. En el proceso olvidan que nuestra Constitución, que tantas veces hemos señalado es de factura más ancha —aunque en tiempos recientes tal contención se encuentre exigua por la desmemoria del Tribunal — , exige que, en aras de proteger el derecho a la intimidad y dignidad de los ciudadanos, sea-mos guardianes de tales garantías al evaluar los criterios y las circunstancias para permitir un registro sin una orden judicial. Más grave aún, una vez adoptan la nueva excep-ción, la aplican erróneamente. Veamos entonces.
B
En Terry v. Ohio, 391 US 1 (1968), el Tribunal Supremo de Estados Unidos determinó que un agente de la Policía puede detener a una persona sospechosa y, por la seguridad del agente, someterla a un cateo o registro superficial para detectar armas, aun ausente de causa probable para arresto. Cabe señalar que al día de hoy este Tribunal no ha adoptado la doctrina desarrollada en Terry. Precisamente, al amparo de la doctrina de Terry, en Minnesota v. Dickerson, supra un oficial de la Policía detuvo a un sujeto que enten-dió se comportaba de manera sospechosa y procedió a reali-zarle un cateo o registro superficial para detectar si tenía armas. Al realizar el registro superficial, el oficial no encon-tró armas. Sin embargo, sintió curiosidad por un pequeño abultamiento que tenía el ciudadano en uno de los bolsillos de la chaqueta que llevaba puesta. Al palpar el abulta-miento, sintió lo que aparentaba ser una bolsa de “crack”. Por tal razón, procedió a registrarlo y, efectivamente, encon-tró una bolsa de “crack”.
*958 El Tribunal Supremo federal sostuvo que, conforme a Terry v. Ohio, supra:
If a police officer lawfully pats down a suspect’s outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect’s privacy beyond that already authorized by the officer’s search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context. Minnesota v. Dickerson, supra, págs. 375-376.
Como se puede apreciar en la cita anterior, en su análi-sis el Tribunal Supremo federal adoptó la excepción de evi-dencia incautada mediante el sentido del tacto, o “plain touch/plain feel”, como corolario de la doctrina de evidencia a plena vista. Al mismo tiempo, descartó el argumento sos-tenido por el Tribunal Supremo de Minnesota de que la evidencia obtenida mediante “plain touch/plain feel” es me-nos confiable y más invasiva que la evidencia a plena vista y que, por lo tanto, violaba el derecho a la intimidad de las personas.(6) Para que se cumpla con la excepción de “plain touch/plain feel” deben estar presentes los mismos requisi-tos de evidencia incautada mediante la excepción de plena vista, según reconocido en Coolidge v. New Hampshire, 403 US 443 (1971). Por tal razón, el Tribunal Supremo federal señaló que en Dickerson no procedía el registro toda vez que el agente tuvo que escudriñar el bulto para palpar la evidencia incautada y que, por ende, la naturaleza delictiva de la evidencia no era aparente de su faz.
Esta doctrina ha sido criticada en distintos artículos de revistas jurídicas por las implicaciones que tiene sobre el *959 derecho a la intimidad de las personas y por el riesgo de que los agentes de la Policía abusen de su poder y preten-dan establecer que la naturaleza delictiva de la evidencia-era inmediatamente aparente cuando en realidad no lo era. Véanse: J.A. Cecere, Searches Woven From Terry Cloth: How the Plain Feel Doctrine Plus Terry Equals Pre-textual Search, 36 B.C. L. Rev. 125 (1994); E.B. Liebman, The Future of the Fourth Amendment After Minnesota v. Dickerson-A “Reasonable” Proposal, 44 Depaul L. Rev. 167 (1994); D.L. Haselkorn, The Case against a Plain Feel Exception to the Warrant Requirement, 54 U. Chi. L. Rev. 683 (1987). De hecho, previo a Dickerson, además del Tribunal Supremo de Minnesota, el Tribunal Supremo de Nueva York en People v. Diaz, 81 N.Y.2d 106 (1993), y el Tribunal Supremo de Washington en State v. Broadnax, 98 Wash.2d 289 (1982), se negaron a reconocer la excepción de la evi-dencia encontrada mediante el sentido del tacto como coro-lario de la excepción de a plena vista, precisamente por las implicaciones que tenía en el derecho a la intimidad de las personas y la poca confiabilidad del sentido del tacto. Por lo tanto, debido a que hoy una mayoría de este Tribunal adopta esta excepción, considerada análoga a la evidencia obtenida a plena vista, procede que, como mínimo, evalue-mos con suma mesura los requisitos establecidos en Dickerson a la luz de la controversia ante nosotros, to-mando en consideración las advertencias ante señaladas a la excepción de evidencia obtenida mediante el tacto.
IV
A
Según sostiene una mayoría de este Tribunal, para que aplique la excepción de evidencia obtenida mediante el sentido del tacto se requiere que:
(1) el objeto se haya descubierto porque se palpó y no por su *960 registro; (2) exista una justificación legal para que el agente esté en el lugar desde donde pudo entrar en contacto con la evidencia; (3) el oficial del orden público contactó la evidencia de forma inadvertida, y (4) la naturaleza delictiva del objeto surge inmediata y razonablemente a través del sentido del tacto sin que el agente lo pueda manipular o escrudiñar en forma alguna. (Énfasis nuestro). Opinión mayoritaria, pág. 943, haciendo referencia a K.W. Inverson, “Plain Feel”: a Common Sense Proposal Following State v. Dickerson, 16 Hamline L. Rev. 247, 277-278 (1992-1993).
En otras palabras, aplican los requisitos reconocidos para evidencia obtenida a plena vista, adecuados a la per-cepción mediante el tacto. Considerando estos requisitos adoptados por la mayoría así como la propia jurisprudencia federal citada con aprobación, una lectura objetiva y sin ánimo prevenido deja claro que en este caso es imposible que, mediante el sentido del tacto, la agente haya podido percibir inmediatamente la naturaleza delictiva del arma de fuego incautada. Veamos.
En Arizona v. Hicks, supra, el Tribunal Supremo federal, al evaluar los requisitos de evidencia obtenida a plena vista, tuvo la oportunidad de abordar el requisito de que la natu-raleza delictiva del objeto suija inmediatamente de la simple observación. En Hicks, en el curso de un registro para dar con el sospechoso de un tiroteo en un apartamento, uno de los agentes se percató de que en el apartamento había unas bocinas que sospechaba eran robadas. El agente pro-cedió a voltear las bocinas para verificar el número de serie. Al conocer el número de serie, constató con el cuartel que en efecto las bocinas habían sido robadas. Por estos hechos, al señor Hicks se le acusó del delito de robo.
AJ resolver esta controversia, el Tribunal Supremo federal sostuvo que la incautación del sistema de bocinas hurta-das mientras la Policía realizaba un registro para encontrar otra evidencia era inválida, toda vez que para conocer la ilegalidad de las bocinas el agente tuvo que voltearlas para leer el número de serie. Según el Tribunal, luego de voltear *961 las bocinas —acto que constituyó un registro— fue que el oficial tuvo conocimiento de la naturaleza delictiva de las bocinas, no obstante haber tenido una sospecha razonable de que las bocinas habían sido hurtadas. Añadió que “the ‘distion between “looking” at a suspicious object in plain view and “moving” it even a few inches’ is much more than trivial for purposes of the Fourth Amendment”. Hicks, supra, pág. 325.
Previo a la determinación del Tribunal Supremo federal en Hicks, el Tribunal de Apelaciones de Estados Unidos para el Sexto Circuito tuvo la oportunidad de evaluar un caso similar a Hicks pero en relación con la incautación de unos rifles en el curso de una orden de registro e incautación de bebidas alcohólicas. U.S. v. Gray, 484 F.2d 352 (6to Cir. 1973). Allí el foro apelativo federal sostuvo que si bien los agentes estaban autorizados a estar en el lugar donde estaban y se habían topado con los rifles inadvertidamente, la naturaleza delictiva de los mismos no era inmediatamente aparente. Una vez el agente copió el número de serie de los rifles y comprobó que habían sido robados, entonces se percató de la naturaleza delictiva de estos. íd. Por tal razón, concluyó que el registro e incautación de los rifles fue inválido.(7)
Posteriormente, en U.S. v. Szymkowiak, 727 F.2d 95 (6to Cir. 1984), el propio Tribunal de Apelaciones de Estados Unidos para el Sexto Circuito sostuvo que un arma perci-bida a simple vista mientras se efectuaba un registro en una casa en busca de otra evidencia, no era suficiente para sos-tener la naturaleza delictiva inmediata del arma de fuego. El foro apelativo federal sostuvo que “[t]he record in [Szymkowiak] is clear that the executing officers who dis *962 covered the weapon could not ‘at the time’ of discovery determine whether its possession was unlawful”. (Enfasis en el original). Szymkowiak, supra, pág. 99. Así, citando con aprobación a Gray, sostuvo que a pesar de que se percibió un arma de fuego, la naturaleza delictiva del arma no era aparente. Szymkowiak, supra, pág. 97.
A la misma conclusión llegó el Tribunal de Apelaciones de Florida en Ray v. State, 634 So.2d 695 (Fla. App. 1994). El foro apelativo intermedio de Florida sostuvo lo si-guiente:
In the present case, the discovery of the pistol was a lawful consequence of the authorized search which brought the pistol within the plain view of Officer Carroll. However, the incriminating character of the pistol was not immediately apparent to Officer Carroll because its defaced serial number could not be seen by the officer until he picked up the pistol and turned it over. In picking up the pistol and turning it over Officer Carroll extended the search beyond the scope permitted by the warrant. (Énfasis nuestro). Id., pág. 696.(8)
Conforme a lo anterior, evaluemos entonces nuestro or-denamiento estatutario respecto a las armas y la aplica-ción del marco jurídico reseñado a los hechos de este caso.
B
En Puerto Rico la Ley de Armas establece que el Super-intendente de la Policía “expedirá una licencia de armas a cualquier peticionario” que cumpla con una serie de requisitos. (Énfasis nuestro). 25 LPRA sec. 456a(a). Entre estos requisitos están: ser ciudadano de Estados Unidos o residente legal de Puerto Rico; haber cumplido veintiún años de edad; tener un certificado de antecedentes penales expedido no más de treinta días previo a la fecha de la solicitud; no ser acusado o estar en proceso de juicio por *963 violar la licencia especial de armas largas y municiones; no ser un ebrio habitual, adicto a sustancias controladas o haber sido declarado incapaz mental por un tribunal, y presentar una (1) declaración jurada de tres personas que no tengan relación alguna de consanguinidad o afinidad con el peticionario que atestigüen que el peticionario goza de buena reputación en su comunidad; entre otros requisitos. 25 LPRA sec. 456a(a).
A su vez, la ley establece que “[l]as armas de fuego se podrán portar, conducir y transportar de forma oculta o no ostentoso”. (Enfasis nuestro). 25 LPRA sec. 456a(d)(l). Véase, además, Reglamento de la Ley Núm. 404 de 11 de septiembre de 2000, según enmendada, conocida como la “Ley de Armas de Puerto Rico”, Reglamento de la Policía de Puerto Rico Núm. 7311 de 5 de marzo de 2008. En tal caso, el concesionario solo podrá portar un (1) arma de fuego a la vez. 25 LPRA sec. 456a(d)(4). Por su parte, en el Art. de la Ley de Armas se establece que para que una persona se encuentre incursa en violación de dicha dispo-sición se requiere que la persona “transporte cualquier arma de fuego [...] sin tener una licencia de armas, o porte cualquier arma de fuego sin tener su correspondiente per-miso para portar armas [...]”. (Enfasis nuestro). 25 LPRA sec. 458c. Es decir, el elemento del delito requiere que la persona transporte un arma de fuego y que no tenga una licencia de armas o un permiso para portar armas.
Si aplicamos las disposiciones de la ley a los hechos de este caso, notamos que al momento cuando el agente efec-tuó el registro sin una orden judicial sobre la cartera del señor Báez López no pudo haber percibido inmediatamente la naturaleza delictiva del arma de fuego incautada. La cartera estaba cerrada y, conforme a la ley, no constituye de su faz un delito portar o transportar un arma de fuego mientras no se haga de forma oculta o no ostentosa.(9)
*964 Por otra parte, cuando la agente palpó lo que según su experiencia era un arma de fuego, no sabía si el señor Báez López poseía una licencia para portar armas de fuego. Tampoco indagó o cuestionó al señor Báez López para saber si éste tenía licencia para portar armas de fuego cuando palpó lo que en su creencia era un arma de fuego. No es hasta que el señor Báez López es trasladado al hospital, tiempo después de que la agente efectuara el registro sobre la cartera, cuando la agente cuestionó al joven sobre el arma y éste le notificó que no poseía licencia para portarla. Fue en ese momento cuando la agente supo de la naturaleza delictiva del arma de fuego.
Cabe señalar que en Dickerson, a diferencia de este caso, existía una sospecha individualizada sobre la persona a raíz de un registro superficial conforme a Terry. Adviértase que la incautación de armas mediante un regis-tro superficial de acuerdo con la doctrina de Terry se fun-damenta en la protección y seguridad de los agentes, y no en que de su faz el arma es un objeto ilegal. Esto es, debido a que cuando un agente realiza un registro superficial au-torizado por Terry se tiene una sospecha sobre la comisión de un delito y el sospechoso pudiese estar armado, se per-mite que los agentes verifiquen si la persona está armada y, en ese registro, Dickerson permitió el registro de material delictivo perceptible al tacto.(10) Por lo tanto, la incau-tación de un arma de fuego que después de un registro superficial resulta ser ilegal está autorizada precisamente por el registro sobre un sospechoso que autoriza Terry.
En este caso, la cadena de eventos que concluyó en el *965 registro de la cartera se inició con un accidente de tránsito. No estamos ante hechos en que hubiese una sospecha in-dividualizada sobre el señor Báez López o en una investi-gación en curso sobre la posible comisión de un delito. Tampoco podemos concluir que el agente se encontraba ante una situación en que tuviese que velar por su seguri-dad o su protección y que lo incitara a tener que registrar la cartera, esto mientras el señor Báez López era atendido por paramédicos. Valga señalar que el señor Báez López, como bien reconoció la agente, estaba consciente al mo-mento en que registró la cartera. Es decir, la agente pudo solicitar la autorización del señor Báez López para abrir la cartera, pudo indagar al señor Báez López sobre lo que en su creencia era un arma de fuego y, más aún, pudo solici-tar, conforme al mandato constitucional, una orden de registro.
C
No obstante lo anterior, hoy una mayoría sostiene que procedía el registro de la cartera y la incautación del arma de fuego por haberse cumplido los requisitos de la excep-ción de evidencia obtenida mediante el tacto. Si bien coin-cidimos en que la agente estaba autorizada a estar donde estaba y que advino en conocimiento de lo que según su creencia y experiencia era un arma de fuego, entendemos que al evaluar el requisito de que la naturaleza delictiva del objeto surja inmediatamente por medio del sentido del tacto, la mayoría va más allá del ámbito mínimo de protec-ción establecido por la jurisprudencia federal. En otras pa-labras, en este caso la mayoría actúa en contravención a lo resuelto por el Tribunal Supremo federal en Dickerson. Y lo hace, no para reconocerle a un ciudadano un marco más amplio de la protección constitucional bajo nuestra Consti-tución —lo que sabemos es perfectamente válido— sino que actúa para restringir los derechos más allá de lo per- *966 mitido en Dickerson. La mayoría se coloca al margen de la Constitución de Estados Unidos conforme a lo interpretado por el foro judicial más alto de ese País. Explicamos.
Para la mayoría, a diferencia de lo establecido en la ju-risprudencia federal, basta con que el objeto sea un arma de fuego para que se active la inmediatez de la naturaleza delictiva del objeto. Sostienen que si un agente palpa lo que aparenta ser un arma de fuego, ello es suficiente para que proceda a realizar un registro sin una orden judicial, a pesar de que de su faz el agente no sabía ni pudo saber que el arma se poseía ilegalmente; esto es, que la naturaleza del objeto era delictiva.(11) Es decir, palpar lo que en su experiencia era un arma de fuego, la cual se encontraba oculta dentro de una cartera, no es suficiente para que la agente pudiese establecer, inmediatamente, la naturaleza delictiva del objeto.
El criterio no es que el agente pueda identificar el objeto como sostiene la mayoría, sino que pueda identificar el ob-jeto mediante el tacto y tenga la creencia inmediata de que es un objeto ilegal. Precisamente en Dickerson, el Tribunal Supremo federal puntualizó que “[r]egardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment’s requirement that the officer have probably cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures”. (Enfasis nuestro). Dickerson, supra, pág. 376. Un arma de fuego en sí misma no se considera contra-bando pues, como señalamos, en nuestra jurisdicción, por ejemplo, cualquier ciudadano que cumpla con ciertos crite-rios razonables de solicitud de portación puede portar un arma de fuego, siempre y cuando el arma se porte de ma-nera oculta y no ostentosa. Consecuentemente, no tenemos *967 duda de que la premisa inarticulada por la mayoría contra-viene las garantías mínimas establecidas en la jurispru-dencia federal, jurisprudencia que la mayoría cita con aprobación.
Adviértase que en la opinión mayoritaria no se mencio-nan los fundamentos para sostener que basta con que se palpe un arma de fuego para que se cumpla con los requi-sitos de la excepción de evidencia obtenida mediante el tacto. Solo se menciona que la agente percibió un arma de fuego dentro de una cartera y, según la mayoría, ese acto de por sí basta para que se cumpla con el requisito de que la naturaleza delictiva del objeto sea inmediata. Esta pre-misa, sin más, parece estar fundamentada en la determi-nación de este Foro en Pueblo v. Del Río, 113 DPR 684 (1982). Allí nos enfrentamos al planteamiento del Sr. Héctor Gerardino Del Río —quien fue acusado de portación ilegal de un arma de fuego— de que los agentes no tenían motivos para arrestarlo, ya que portar un arma de fuego a plena vista no le da derecho a un agente de la Policía a intervenir con él. Del Río, supra, pág. 688. Al interpretar la Ley de Armas entonces vigente —Ley Núm. 17 de 19 de enero de 1951, 25 LPRA ants. sees. 411-454 (derogada)— sostuvimos que era innecesario la discusión sobre este asunto, ya que
[...] en la etapa del juicio, “[e]n casos de portación o posesión ilegal de armas de fuego el fiscal no viene obligado a probar que el acusado no tenía licencia con tal fin, cuando se ha ale-gado tal hecho en la acusación y se ha probado la portación o posesión del arma, ya que en ellos surge la presunción de por-tación ilegal y es al acusado a quien incumbe destruir tal presunción”. (Énfasis nuestro). Del Río, supra, págs. 688-689.
Para apoyar esta contención, añadimos lo siguiente:
Es sumamente importante que mantengamos presente el hecho de que en nuestra jurisdicción la posesión y/o portación de un arma de fuego no es un derecho y sí un privilegio', en otras palabras, es una “actividad” controlada o restringida por *968 el Estado. Sobre este punto no hay que abundar mucho; ello surge con meridiana claridad de una simple lectura de las disposiciones de la Ley de Armas de Puerto Rico, Ley Núm. 17 de 19 de enero de 1951, según enmendada. 25 LPRA secs. 411— 454. (Énfasis nuestro y en el original). Id., pág. 689.
Ahora bien, hay varios señalamientos que deben reali-zarse sobre nuestros pronunciamientos en Del Río. En primer lugar, según los hechos en Del Río, los agentes se ubi-caron en el edificio donde pudieron observar al señor Del Río, tras recibir una llamada telefónica que apuntaba a la posible captura de uno de los prófugos más buscados en Puerto Rico. Cuando el señor Del Río y un acompañante salieron del mismo edificio que observaban los agentes, és-tos se percataron de que tanto el señor Del Río como su acompañante llevaban armas de fuego. El señor Del Río y su acompañante se montaron en un vehículo. Momentos después, los agentes se acercaron al vehículo del señor Del Río, se identificaron como agentes del orden público y soli-citaron al señor Del Río que detuviera el vehículo. En ese instante se le preguntó si tenía la licencia para portar el arma de fuego.
Cuando el señor Del Río aceptó que no poseía licencia para portar armas de fuego, el agente le notificó que estaba bajo arresto y procedió a realizar el registro. Por estos he-chos fue acusado por la portación ilegal de armas de fuego. Los hechos de Del Río claramente se distinguen de los he-chos en el caso ante nuestra consideración. En este caso, la agente atendía un accidente de tránsito ordinario. No es hasta que la agente llega al hospital que le preguntó al se-ñor Báez López si poseía licencia para portar armas de fuego. En ese momento ya se había registrado la cartera del señor Báez López. Tampoco la agente realizaba una investi-gación sobre un sospechoso o la comisión de un delito.
Además, en Del Río se interpretó la Ley de Armas apro-bada en el 1951, ley que fue aprobada a raíz de los sucesos ocurridos el 30 de octubre de 1950 cuando se intentó derro- *969 car el gobierno mediante el uso de armas de fuego. Informe P. de la C. 3447, Comisión de lo Jurídico Penal de la Cá-mara de Representantes de Puerto Rico, pág. 4. Por los eventos ocurridos el 30 de octubre de 1950, esta legislación limitó significativamente la posibilidad de que un ciuda-dano común pudiese obtener una licencia para la portación armas de fuego. En esencia, el Artículo 20 de la ley limi-taba el uso de armas de fuego a un reducido número de funcionarios de gobierno, entre éstos, los miembros de las fuerzas armadas, los miembros de la Policía y los jueces y fiscales. 25 LPRA ant. see. 430 (derogada).
En caso de que un ciudadano interesara solicitar un arma de fuego, sólo podía poseerla en su domicilio y si de-mostraba, a juicio del tribunal, que estaba en peligro de muerte o grave daño corporal. 25 LPRA ant. see. 431 (derogada). Por lo tanto, cobra particular importancia el hecho de que en Del Río el arma estaba a simple vista, acto que en sí mismo levantaba sospecha de la comisión de un delito. Consecuentemente, se validó la evidencia incautada percibida mediante el sentido de la vista. Según reseñado, esto contrasta con la Ley de Armas vigente y los requisitos para solicitar la portación de armas de fuego.
Desde entonces, al interpretar la Ley de Armas de 1951, este Tribunal ha repetido la norma establecida en Del Río. Véase Rivera Pagán v. Supte. Policía de P.R., 135 DPR 789 (1994); Pueblo v. Corraliza Collazo, 121 DPR 244 (1988). No obstante, a partir de la aprobación de la nueva Ley de Armas y del desarrollo en la jurisprudencia federal sobre la portación y posesión de armas de fuego, no nos hemos expresado sobre nuestros pronunciamientos en Del Río.(12)
*970 Somos del criterio que, conforme a la Ley de Armas vi-gente —y la jurisprudencia federal citada en apoyo — , la mera portación de un arma, transportada en forma oculta y no ostentosa como establece la ley, no crea de su faz una presunción de ilegalidad o de contrabando, como parecía crear la legislación anterior al momento en que decidimos el caso Del Río. Por lo tanto, no podemos avalar que la interpretación sobre esta legislación descanse, sin análisis ulterior, en nuestros pronunciamientos sobre una legisla-ción derogada. En particular, para determinar si en este caso se establecieron las excepciones para realizar un re-gistro sin una orden judicial, excepciones en las que sub-yace la protección al derecho a la intimidad.
Por ejemplo, en Com. v. Cruz, 459 Mass. 459 (2011), el Tribunal Supremo de Massachusetts, al evaluar la eviden-cia incautada mediante una detención y un registro de un vehículo, sostuvo que con la aprobación de la nueva legis-lación que despenalizaba el consumo de una onza de marihuana, y contrario a lo que había reconocido ese foro previo a la nueva legislación, el olor a marihuana por sí solo no era suficiente para generar los motivos fundados para rea-lizar un registro.
Por lo tanto, a pesar de que la posesión de más de una onza continuaba siendo material delictivo, añadió que la sospecha levantada debía ser sobre material delictivo y no sobre una infracción civil. A tales fines, sostuvo:
Articulable facts, then, must demonstrate a suspicion that the defendant possessed more than one ounce of marijuana, because possession of one ounce or less of marijuana is not a crime. There are no facts in the record to support a reasonable suspicion that the defendant possessed more than one ounce of marijuana. (Cita y escolio omitidos). Com. v. Cruz, supra, pág. 469.
Por lo tanto, el más alto Foro de Massachusetts invalidó el registro de la evidencia incautada. Coincidimos con los criterios establecidos por el Tribunal Supremo de Mas *971 sachusetts al aplicarlos a la controversia de este caso en que se percibe, sin más, la posesión de un arma de fuego sin que se puedan articular hechos que conduzcan a al-guna sospecha sobre la utilización del arma de forma ilegal o sobre la ausencia de licencia para portar el arma. En este caso, la agente admitió que el registro surgió por la “curio-sidad” de haber percibido un arma de fuego. No tenía sos-pecha alguna de que se había cometido un delito ni tam-poco sospechaba si el señor Báez López tenía o no licencia para portar la misma.
En suma, la decisión de una mayoría de este Tribunal cede ante el poder policiaco del Estado(13) para realizar un registro sin una orden judicial, dejando en rezago el valor conferido por nuestros constituyentes al derecho a la intimidad. En el proceso, no sólo prescinde de la protección de factura más ancha al derecho a la intimidad que esta-blece nuestra Constitución —que hoy es letra muerta — , sino que al adoptar la doctrina de evidencia incautada me-diante el tacto restringe el ámbito mínimo de protección que establece la jurisprudencia federal, colocándose al margen de la propia Constitución federal. Por lo tanto, con mucho pesar disiento del curso seguido por una mayoría de este Tribunal. En su lugar, hubiese confirmado la determi-nación de los foros inferiores y suprimiría la evidencia incautada.
El dictamen de hoy me obliga a esta última reflexión. En los últimos años, Puerto Rico ha sido testigo de un ver-tiginoso aumento en la criminalidad, especialmente en la comisión de delitos graves con armas de fuego. Hace ape-nas un (1) año se trató de enmendar la Constitución del Estado Libre Asociado de Puerto Rico para limitar el dere-cho constitucional a la fianza, como mecanismo para redu- *972 cir la criminalidad. No es un secreto el sentido de insegu-ridad profunda que aqueja a la inmensa mayoría de los ciudadanos de este País. Todo aquello que nos hace sentir más tranquilos, más seguros, le damos la bienvenida. Aun-que en ocasiones, sin embargo, ciegamente.
Buscamos seguridad. La necesitamos. Vivir sin seguridad es difícil. Vivir exclusivamente para ella es peligroso. [...]
[N]o hemos de olvidar que la seguridad ha de estar al servi-cio de la libertad y no la libertad supeditada a la seguridad. [...]
Entre el miedo y la necesidad, la seguridad habría de ser un aliado. Ahora bien, más parece que no pocas veces sobre ese miedo se sustenta una desmedida consideración de la seguri-dad, que se ofrece como coartada del inmovilismo o de la deli-mitación o eliminación de los derechos individuales. (Énfasis en el original). Á. Gabilondo, Seguramente, en: El País, 7 de agosto de 2012, disponible en: http://blogs.elpais.com/el-salto-del-angel/2012/08/seguramente.html (última visita, 5 de diciembre de 2013).
Como bien dijo Benjamín Franklin: “aquellos que sacri-fican la libertad por seguridad no merecen tener ninguna de las dos”. íd.

 M. Foucault, Panopticism, Discipline & Punish: The Birth of the Prison, 214 (Alan Sheridan trad.), Pantheon 1977, (1975).

 En la declaración jurada, la agente Rivera Alvarado sostuvo que procedió a “abrir la cartera [sic] para tratar de localizar una tarjeta de identificación con foto del joven, y me percaté que en el interior de la misma había una arma de fuego”.

 De hecho, en Pueblo v. Bonilla, 149318, 329 (1999), señalamos que, “[a] pesar de que la protección contra registros y allanamientos se encuentra redactada en idénticos términos en ambas Constituciones, por gozar nuestra Constitución de una Vitalidad independiente’, podemos darle a la garantía un contenido distinto y mayor. Esto es, podemos interpretarla de forma más beneficiosa al acusado”.

 La Regla 234 de Procedimiento Criminal establece que la evidencia obtenida en violación a la garantía constitucional contra registros, incautaciones y allana-mientos irrazonables, se suprimirá y no se admitirá en los tribunales como prueba de la comisión de un delito. 34 LPRAAp. II. Según el Prof. Ernesto L. Chiesa Aponte, esta norma de exclusión persigue varios propósitos importantes, a saber: (1) provee un remedio efectivo a la víctima del registro y allanamiento irrazonable o ilegal; (2) evita que el gobierno se beneficie de sus propios actos ilegales; (3) preserva la inte-gridad del Tribunal, y (4) disuade a los oficiales del orden público a que no repitan las acciones objeto de impugnación. E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, Colombia, Ed. Forum, 1991, T. I, págs. 284-285.

 Añádase a las excepciones mencionadas la reconocida por una mayoría de este Tribunal en Pueblo v. Díaz, Bonano, 176 DPR 601 (2009), sobre la evidencia obtenida en un lugar público como resultado de la utilización de canes para olfatear.

 Para descartar el argumento de que la evidencia obtenida mediante el sen-tido del tacto es menos confiable que la evidencia a plena vista, el Tribunal Supremo federal se limitó a señalar: “Even if it were true that the sense of touch is generally less reliable than the sense of sight, that only suggests that officers will less often be able to justify seizures of unseen contraband”. Minnesota v. Dickerson, 508 US 366, 376 (1993). En cuanto a que ésta es más invasiva a la privacidad, sostuvo: “is inapposite in light of the fact that the intrusion the court fears has already been authorized by the lawful search for weapons”. Íd., pág. 377.

 En U.S. v. Truitt, 521 F.2d 1174 (6to Cir. 1975), el foro apelativo distinguió los hechos de U.S. v. Gray, 484 F.2d 352 (6to Cir. 1973), para sostener la validez del registro e incautación de una escopeta con los cañones recortados. Según Truitt, en ese caso la escopeta con los cañones recortados en sí misma daba cuenta de la pro-babilidad de su naturaleza delictiva. Para llegar a tal conclusión, sostuvo que la escopeta con los cañones recortados no es un arma comúnmente utilizada y consideró las circunstancias concomitantes al registro mediante orden.

 Conviene señalar que los casos anteriormente reseñados versan sobre evi-dencia obtenida a plena vista, sentido más confiable que el del tacto, como bien consideró el Tribunal Supremo federal en Dickerson, supra, pág. 376.

 En relación con la expectativa de la intimidad sobre la cartera, como bien reconoce una mayoría de este Tribunal, no hay duda de que el señor Báez López *964 tenía sobre ésta una expectativa de intimidad razonable reconocida por nuestra sociedad. Por lo tanto, no discutiremos ese asunto.

 El Tribunal Supremo federal lo resumió de esta manera: “If a police officer lawfully pats down a suspect’s outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect’s privacy beyond that already authorized by the officer’s search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-oieia context”. (Énfasis nuestro). Dickerson, supra, págs. 375-376.

 Particularmente, ante el arma incautada en este caso, una Smith & Wesson, calibre .40, cuya obtención no está sujeta a los requisitos, por ejemplo, para las armas de asalto, 25 LPRA see. 456, y calibre comúnmente utilizado por portadores de armas de fuego en Puerto Rico.

 Nuestros pronunciamientos en Pueblo v. Del Río, 113 DPR 684 (1982), están sujetos a la evaluación y discusión de este Tribunal sobre las determinaciones recientes del Tribunal Supremo federal de reconocer el derecho de poseer y portar armas como un derecho fundamental (District of Columbia v. Heller, 554 US 570 (2008)) y, posteriormente, extender la aplicabilidad de este derecho a los estados (McDonald v. Chicago, Ill., 130 S. Ct. 3020, 177 L.Ed.2d 894 (2010)). Adviértase que en Del Río sostuvimos que poseer y portar un arma en Puerto Rico es un privilegio, no un derecho. Del Río, supra, pág. 689.

 Poder que en palabras de Giorgio Agamben, “is the site where the contiguity if not the constitutive exchange between violence and law characterizes the figure of the sovereign is visible in all its nakedness”. G. Agamben, The Sovereign Police, en: B. Massumi, ed., The Politics of Everyday Fear, 1993), pág. 61.