191 P.3d 1278 (2008)
STATE of Washington, Respondent,
v.
Bee XIONG, Petitioner.
No. 80236-0.
Supreme Court of Washington, En Banc.
Argued May 22, 2008.
Decided September 11, 2008.
*1279 Steven J. Tucker, Attorney at Law, Mark Erik Lindsey, Spokane County Prosecuting Attorneys, Spokane, WA, for Respondent.
Eric Broman, Nielsen Broman & Koch PLLC, Seattle, WA, for Petitioner.
Shaakirrah R. Sanders, The Defender Association, Sarah A. Dunne, ACLU, Nancy Lynn Talner, Attorney at Law, Douglas B. Klunder, Attorney at Law, Seattle, WA, Amicus Curiae on behalf of American Civil Liberties Union, Asian Bar Association, Latino/a Bar Association, Loren Miller Bar Association.
ALEXANDER, C.J.
¶ 1 This case presents the question of whether the Court of Appeals erred in reversing the trial court's suppression of contraband that was obtained as a direct result of a law enforcement officer's search of Bee Xiong's person. We reverse the Court of Appeals.

I
¶ 2 Five members of a joint law enforcement task force went to what they believed was Kheng Xiong's residence. Their intention was to serve him with an arrest warrant. In addition to the warrant, the officers had in their possession a black and white photograph of Kheng Xiong, which they intended to use in identifying him. While they were at the residence, a minivan pulled up in front of the house. One of the officers thought the passenger in the minivan was Kheng Xiong. The passenger was actually Bee Xiong (Bee), the defendant in this case.
¶ 3 The officers immediately handcuffed Bee and then performed a pat-down frisk of him. When asked, Bee told the officers that his name was Bee Xiong and that he was Kheng Xiong's brother. Although Bee did not have any identification on his person, he showed the officers a tattoo on his arm of the letter "B." Based on their examination of the photograph, the officers were unable to determine if the man before them was Kheng Xiong.
¶ 4 One of the officers had earlier noticed a bulge in Bee's front pocket. When the officer touched the bulge, Bee appeared to pull away. The officer then asked Bee if there was anything in his pocket that could hurt the officer. Bee responded, "[N]o." Report of Proceedings (RP) at 12. Bee also indicated that he did not want to be searched. The officer proceeded to squeeze the bulge in Bee's pocket and then conferred with other officers, telling them he thought there was a "potential weapon" in Bee's pocket. Id.
¶ 5 One of the officers, Ramsey, then reached into Bee's pocket and pulled out a glass smoking pipe that was wrapped in facial tissue. The pipe apparently contained some residue that the officers believed was a controlled substance. Concluding that the pipe was "for smoking methamphetamine or some illegal substance," the officers arrested Bee for possession of a controlled substance. Id. They then searched the minivan incident to the arrest and turned up a scale, some cash, and a small box in which there was a quantity of methamphetamine.
¶ 6 A short time later, Bee and Kheng Xiong's mother arrived at the residence and identified the man under arrest as Bee Xiong. One of the officers who testified at the suppression hearing said that he would not have "frisked" Bee if Bee had been correctly identified earlier. Id. at 20.
¶ 7 Bee was charged in Spokane County Superior Court with possession of methamphetamine with intent to deliver. Bee's counsel moved before trial to suppress the evidence that flowed from the search of Bee's person, contending that the officers lacked (1) a reasonable or articulable suspicion which would justify a belief that Bee was armed and dangerous, and (2) a basis to believe that Bee was the target of the arrest warrant.
*1280 ¶ 8 Officer Ramsey, the officer who seized the glass pipe from Bee, testified at the suppression hearing. Although Ramsey did not express a concern that Bee could access a weapon, he said it was "possible." Id. at 18; see id. at 21. Another officer, Sergeant McCabe, indicated that he "wasn't immediately concerned" but said that "at some point" when Bee's handcuffs were removed, "I didn't want him having access to any weapons." Id. at 25.
¶ 9 The trial court granted Bee's suppression motion after concluding that there was no testimony of "any articulable facts specific and detailed [from] which the officer could reasonably infer the detained individual was armed and dangerous." Clerk's Papers at 17. Based on its suppression of the evidence, the trial court dismissed the charge against Bee.
¶ 10 The Court of Appeals, in a split decision, reversed the trial court, holding that "the [officers'] safety concerns" justified the search. State v. Bee Xiong, 137 Wash.App. 720, 725, 154 P.3d 318 (2007). We thereafter granted review. 163 Wash.2d 1001, 180 P.3d 783 (2008).

II
¶ 11 "We review conclusions of law in an order pertaining to suppression of evidence de novo." State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999) (citing State v. Johnson, 128 Wash.2d 431, 443, 909 P.2d 293 (1996)), overruled on other grounds by Brendlin v. California, ___ U.S. ___, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).

III
¶ 12 Bee contends that the Court of Appeals erred in reversing the trial court's suppression order, arguing that the law enforcement officers who seized the pipe from Xiong, and thereafter arrested him, did not have reasonable grounds to believe that he was armed and dangerous. In support of this contention, Bee's counsel calls our attention to a decision of the Court of Appeals in which the facts were similar to those before us now, State v. Galbert, 70 Wash.App. 721, 855 P.2d 310 (1993). There, a police officer, after entering a house pursuant to a search warrant, performed a frisk of Galbert, describing the frisk as a "`quick around the mid-section check.'" Id. at 722, 855 P.2d 310. After this frisk, the officer discovered marijuana on a table less than two feet from where Galbert was located. This caused the officer to perform a second frisk. Feeling "`a lump'" in Galbert's front right pants pocket, which the officer thought "`could have been a weapon of some type,'" the officer reached into Galbert's pants pocket and retrieved the object. Id. at 723, 855 P.2d 310. It was later determined to be rock cocaine. The record showed that Galbert, who was handcuffed throughout, had been cooperative with the police officer prior to the seizure of the cocaine and had made no moves that could be interpreted as an attempt to retrieve a weapon. Noting an absence of any evidence that Galbert could reach his pants pocket while handcuffed, the Court of Appeals concluded that the second frisk was not supported by a reasonable suspicion that Galbert was armed and dangerous. Therefore, it determined that the seizure of the cocaine was unlawful. In doing so, the court said:
Although probable cause is generally required to perform a search and seizure, under narrowly drawn and carefully circumscribed circumstances lesser cause suffices. See Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); State v. Broadnax, 98 Wash.2d 289, 293-94, 654 P.2d 96 (1982). An officer may frisk a person for weapons if the officer has reasonable grounds to believe the person is armed and dangerous. See Terry; Broadnax. The officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). "A `generalized suspicion' is insufficient to justify a frisk", State v. Sweet, 44 Wash.App. 226, 234, 721 P.2d 560, review denied, 107 Wash.2d 1001 (1986), even *1281 when a person is present at a location the police are authorized to search by a valid warrant. Ybarra v. Illinois, 444 U.S. 85, 92-94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979); Broadnax, 98 Wash.2d at 295 [654 P.2d 96].
Id. at 724-25, 855 P.2d 310.
¶ 13 In a recent case, State v. Setterstrom, 163 Wash.2d 621, 183 P.3d 1075 (2008), this court reached a result similar to that reached by the Court of Appeals in Galbert. In Setterstrom, the record disclosed that the Tumwater Police Department received a report that two men were at the Department of Social and Health Services office in Tumwater and appeared to be under the influence of drugs. Two police officers responded to the scene and made contact with the men, one of whom was Michael Setterstrom. After questioning Setterstrom, the officers determined that he was lying to them about his true identity. They also noticed that he appeared to be "nervous [and] fidgety." Id. at 627, 183 P.3d 1075. Setterstrom did not, however, make any threatening gestures and, indeed, he did not even stand when the officers approached him. Nevertheless, one of the police officers performed a pat-down of Setterstrom for weapons. Feeling hard objects in Setterstrom's front pants pocket, the officer reached into the pocket and removed everything inside, including a small plastic baggie filled with white powder. The officer testified that he took this action even though the objects did not feel like a gun.
¶ 14 This showing, we concluded, was not sufficient to justify a frisk for weapons, observing that "[a]t most, the record show[ed] that Setterstrom was under the influence [and that] this is not a crime." Id. We went on to say that an officer may "frisk a person for weapons, but only if (1) he justifiably stopped the person before the frisk, (2) he has a reasonable concern of danger, and (3) the frisk's scope is limited to finding weapons." Id. at 626, 183 P.3d 1075 (citing State v. Collins, 121 Wash.2d 168, 173, 847 P.2d 919 (1993)). Significantly, we stated that police officers must have a basis for a frisk beyond the mere observation that a person of interest was nervous, fidgety, and had lied about his name.
¶ 15 Our decision here is guided primarily by our decision in Setterstrom. As noted above, Bee was handcuffed and patted down almost immediately after the officers contacted him. After this initial frisk, Bee, like Setterstrom, made no movements that could be interpreted as an attempt to retrieve a weapon. Furthermore, he gave no indication that he could reach his pants pocket while he was handcuffed, nor did he attempt to do so. Finally, it is noteworthy that Bee, like Galbert and Setterstrom, was not uncooperative with the police officers.
¶ 16 In determining that the trial court erred in suppressing the evidence seized from Xiong's pocket and from the minivan, incident to Xiong's arrest, the majority at the Court of Appeals placed reliance on what they said was the testimony of the police officers that "they feared for their safety." Xiong, 137 Wash.App. at 725, 154 P.3d 318. There is nothing in the record to support such a conclusion. As noted above, Officer Ramsey never expressed concern that Bee might access a weapon. He simply said that it was "possible" for someone in handcuffs to retrieve something from his pocket. RP at 18; see id. at 21, 154 P.3d 318. Sergeant McCabe's testimony was similar, the officer indicating that he "wasn't immediately concerned" that Bee was a threat, only that he did not want Bee to access an alleged weapon once his handcuffs were removed. Id. at 25, 154 P.3d 318.
¶ 17 Where the propriety of the initial detention of Bee is established,[1] law enforcement officers may perform, as they did here, a protective frisk in the nature of a pat-down in order to ascertain if the suspect is carrying a weapon or weapons. The scope of the *1282 frisk, however, must be limited to protective purposes. If an officer cannot point to specific articulable facts that create an "objectively" reasonable belief that a suspect is armed and "presently" dangerous, then no further intrusion is justified. Here, as the dissenting judge at the Court of Appeals correctly observed, there were no specific facts to support a reasonable belief that Bee was armed and presently dangerous. Xiong, 137 Wash.App. at 726, 154 P.3d 318 (Schultheis, A.C.J., dissenting). Indeed, as the dissenter pointed out, Bee was cooperative with the police, he made no effort to flee, and he did not make any moves that suggested he could reach into his pants pocket. Id. at 728, 154 P.3d 318. Furthermore, he was handcuffed at all times and he identified himself from the start. Although the officers who confronted Bee may legitimately have had some generalized concerns about safety, none were specific to Bee and, thus, the officers had no basis for searching his pants pocket. It follows that the subsequent arrest of Xiong was unlawful as was the search of the minivan that followed the arrest. As we stated in Setterstrom, "officers may protect themselves when the situation reasonably appears dangerous, but a frisk is a narrow exception to the rule that searches require warrants. The courts must be jealous guardians of the exception in order to protect the rights of citizens." Setterstrom, 163 Wash.2d at 627, 183 P.3d 1075 (citing State v. Hudson, 124 Wash.2d 107, 112, 874 P.2d 160 (1994)).
¶ 18 In sum, we conclude that the trial court correctly suppressed the contraband. The Court of Appeals is reversed.
WE CONCUR: CHARLES W. JOHNSON, BARBARA A. MADSEN, RICHARD B. SANDERS, TOM CHAMBERS, SUSAN OWENS, MARY E. FAIRHURST, JAMES M. JOHNSON and DEBRA L. STEPHENS, JJ.
NOTES
[1] The trial court held that the initial detention was appropriate, and Bee's briefing at the Court of Appeals, which suggested otherwise, was found by that court to be insufficient. Here, Bee relied merely on his briefing at the Court of Appeals. Furthermore, the State is not claiming that the search is justified as a search incident to a mistaken arrest. See Br. of Appellant at 5.

Amicus American Civil Liberties Union of Washington (ACLU) has asked us to delve into the question of the legality of the initial detention and to "clarify the standards for detention of a person of uncertain identity while attempting to serve an arrest warrant." Br. of Amicus Curiae ACLU at 17. We decline to address that issue because it was not raised by the State or Bee. Amicus cannot raise an issue not properly raised by a party to the case. Madison v. State, 161 Wash.2d 85, 104 n. 10, 163 P.3d 757 (2007).