IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77934-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| SYDNER, BRANDON MICHAEL, | ) | |
| DOB: 10/20/1985, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 29, 2019 |

SCHINDLER, J. — Brandon Michael Sydner seeks reversal of his conviction for possession of a controlled substance committed while on community custody. Sydner challenges denial of the motion to suppress the drugs the police seized during an investigative Terry[1] stop. We affirm.

## FACTS

Just after 8:30 p.m. on the evening of October 20, 2017, Everett Police Department officers responded to several 911 calls reporting a man and woman were involved in a robbery and assault at the Everett Mall Ulta Beauty store, including 911 calls from a store employee and a mall security employee. The 911 calls reported the woman was "[a]ssociated" with a male and after they left the store, the man and the

---

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

woman walked toward the back corner of the shopping mall parking lot toward a Red Robin restaurant. The police testified:

Information was there was multiple reporting parties calling with information that indicated one female fought with the employees at the store when they attempted to detain her for a shoplift. Another reporting party stated there was a male and female that they were leaving from the location and headed over to that area.

The 911 calls describe the male suspect as a white man with his hair pulled back in a ponytail, wearing black clothing and khaki boots, and possibly carrying a purse.

Within a couple of minutes of the 911 dispatch, patrol officer Devin Hackett saw a man, later identified as Brandon Michael Sydner, about 300 yards from Ulta Beauty in a dimly lit alley between Red Robin and a PETCO store. The area was near a dumpster not intended for public access. Officer Hackett said it was "completely dark" outside. There was a steep, eight-foot embankment near Sydner. Sydner was wearing black clothes and khaki boots and was "clutching a couple of items" in his hands. Officer Hackett testified that Sydner "perfectly" matched the description he received from dispatch.

Officer Hackett got out of the patrol car. Sydner stood with his hands slightly raised, "looking left and looking right." Sydner repeatedly refused to comply with Officer Hackett's commands to sit down. Sydner told Officer Hackett he "had the wrong guy" and "it was all the girl." Officer Hackett called for backup.

Officer Hackett noticed a bulge in the front pocket of Sydner's pants. Officer Hackett placed Sydner in handcuffs behind his back. Officer Hackett walked with Sydner to the patrol car and conducted a protective frisk for weapons. Officer Hackett felt a hard, cylindrical object in the front pocket of Sydner's pants. The object was

several inches long and at least an inch in diameter. Officer Hackett could not identify the object but thought it could be a weapon or could contain a weapon. Officer Hackett removed the object from Sydner's pants and set it aside on top of the patrol car.

When Officer Thaddeus Halbert arrived, he heard Sydner yelling at Officer Hackett. While Officer Hackett conducted the protective frisk, Officer Halbert searched the area near the dumpster. Officer Halbert found a purse behind the dumpster.

Meanwhile, police officers had detained the female suspect. The female told the officers that she left Ulta Beauty with her "boyfriend" Brandon Sydner. Officer Hackett and Officer Halbert obtained a photograph of Sydner from the Washington State Department of Licensing database. The photograph matched the male that Officer Hackett detained. The police database showed an outstanding felony warrant for Sydner. Officer Hackett arrested Sydner. After the arrest, Officer Hackett inspected the object he had removed from Sydner's pocket. There were narcotics in three interlocking containers.

The State charged Sydner with one count of possession of a controlled substance. The State alleged Sydner committed the crime while on community custody. Sydner filed a motion to suppress the evidence seized during the investigative stop. Sydner argued Officer Hackett (1) did not have reasonable suspicion that he was engaged in criminal activity and (2) exceeded the scope of a weapons frisk.

Officer Hackett and Officer Halbert testified at the CrR 3.6 hearing. The court denied the motion to suppress. The court entered written findings of fact and conclusions of law.

Sydner waived his right to a jury trial and agreed to a trial on stipulated facts. The court found Sydner guilty of possession of heroin and methamphetamine while on community custody.

ANALYSIS

Terry Stop

Sydner challenges the trial court's denial of his motion to suppress the drugs. Sydner claims the Terry[2] stop was unlawful because Officer Hackett lacked individualized reasonable suspicion to believe Sydner was involved in criminal activity.

In reviewing the denial of a motion to suppress, we review the findings of fact for substantial evidence and the conclusions of law de novo. State v. Fuentes, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). "Evidence is substantial when it is enough 'to persuade a fair-minded person of the truth of the stated premise.'" State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009) (quoting State v. Reid, 98 Wn. App. 152, 156, 988 P.2d 1038 (1999)). Unchallenged findings of fact entered following a suppression hearing are verities on appeal. State v. Gaines, 154 Wn.2d 711, 716, 116 P.3d 993 (2005).

The Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution protect against unlawful searches and seizures and unwarranted government intrusions into private affairs. Although article I, section 7 provides greater protection than the Fourth Amendment, "[i]n a challenge to the validity of a Terry stop, article I, section 7 generally tracks the Fourth Amendment analysis." State v. Z.U.E., 183 Wn.2d 610, 617, 352 P.3d 796 (2015).

A warrantless search is per se unreasonable under article I, section 7 unless the search falls under one of the carefully drawn and jealously guarded exceptions to the

---

[2] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

warrant requirement. State v. Patton, 167 Wn.2d 379, 386, 219 P.3d 651 (2009). A brief investigative Terry stop is an exception to the warrant requirement. State v. Gatewood, 163 Wn 2d 534, 539, 182 P.3d 426 (2008). A Terry stop is lawful when a law enforcement officer has a reasonable suspicion based on specific and articulable facts known to him at the inception of the stop that the detained person was involved in a crime. Fuentes, 183 Wn.2d at 158; Z.U.E., 183 Wn.2d at 617. Specific and articulable facts must demonstrate more than a generalized suspicion or hunch that the person detained has committed a crime. Z.U.E., 183 Wn.2d at 618. In evaluating reasonable suspicion, the reviewing court examines the totality of the circumstances known to the officer. State v. Glover, 116 Wn.2d 509, 514, 806 P.2d 760 (1991). The totality of the circumstances include the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty. State v. Acrey, 148 Wn.2d 738, 747, 64 P.3d 594 (2003).

In denying the motion to suppress, the court found specific and articulable facts and a valid basis to detain Sydner. The following pertinent findings of fact and conclusions of law state:

a) Police may properly initiate an investigative detention if they have a reasonable and articulable suspicion that the individual stopped is involved, or is about to be involved, in criminal activity. State v. Marcum, 149 Wn. App. 894[, 205 P.3d 969] (2009). Here, the officer who detained Mr. Sydner had received information from dispatch that a male was seen in the company of the female who was the primary suspect of what, at that time, was broadcast as a robbery from a store at the Everett Mall. He encountered Mr. Sydner shortly after this information was broadcast.

b) The male and female were described by dispatch as headed in the direction of a Jack in the Box, which the Court knows from personal experience is in the same general area as a PETCO and a Red

Robin restaurant, locations that were testified to during the [CrR] 3.6 hearing. Additionally, the male was described as wearing black clothing with khaki colored boots and having a pony tail. He was described as a white male.

c) The officer testified that when he first saw Mr. Sydner, he immediately concluded he matched the broadcast description of the male suspect. Mr. Sydner was wearing black clothing and had a personal appearance similar to the description broadcast about the male who was accompanying the primary suspect.

d) Defense counsel identifies Mr. Sydner as a black male in her briefing. The state refers to Mr. Sydner as being a white male. The court does not know how Mr. Sydner self-identifies his race, but observed his skin color to be such that . . . the court would not presume to identify Mr. Sydner as belonging to any one racial category. His skin tone is light.

e) These facts, taken together, provide a sufficient factual basis to authorize the officer's initial contact and detention of Mr. Sydner under Terry v. Ohio. The facts known to the officer were not innocuous facts; he was responding to a specific and recent report of a robbery in which a male wearing black clothing was associated with the primary female suspect.

Sydner does not challenge these findings of fact and legal conclusions.[3] Sydner

challenges findings of fact d, f, and h:

d) Officer Hackett found a male matching the description of the white male wearing dark clothing.

. . . .

f) Instead [of sitting down], the male raised his hands slightly and looked around him. The officer was concerned he was looking for a way to leave. Officer Hackett again commanded him to sit down, and the defendant did not.

. . . .

h) Officer Hackett handcuffed him for a number of reasons. One of them was for officer safety, Officer Hackett was alone in a dimly lit area with a subject who matched the description of [an] individual associated with a robbery, who was not following instructions and not following commands.

Sydner does not assign error or address these findings in his argument. Nor

does he explain how these findings lack evidentiary support. Accordingly, we treat the

---

[3] To the extent that the conclusions of law encompass factual findings, we treat those aspects as findings of fact. See Willener v. Sweeting, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

findings as verities on appeal. In re Det. of Belcher, 196 Wn. App. 592, 600 n.1, 385 P.3d 174 (2016) (citing State v. Bonds, 174 Wn. App. 553, 562, 299 P.3d 663 (2013)).

Sydner claims his detention was unlawful because the police had no information to suggest that he was the person who committed a crime at the Ulta Beauty store or had a relationship with the female suspect. Citing State v. Thompson, 93 Wn.2d 838, 613 P.2d 525 (1980), Sydner argues mere proximity to another person suspected of criminal activity cannot justify a Terry stop.

In Thompson, a state trooper received reports that an occupant of a Cadillac on the freeway was waiving a handgun. Thompson, 93 Wn.2d at 839. The trooper followed a car matching the reported description to the Southcenter mall parking lot. Thompson, 93 Wn.2d at 839. The Cadillac stopped next to a Chrysler parked some distance from other vehicles. The trooper parked in front of the Cadillac and ordered the occupants out of the car. Thompson, 93 Wn.2d at 839. The driver of the Chrysler, later identified as Thompson, got out of the car and started walking quickly toward the mall. Thompson, 93 Wn.2d at 839-40. The trooper ordered Thompson to stop and arrested him on an outstanding warrant. Thompson, 93 Wn.2d at 840. The police found drugs during a search of Thompson's car. Thompson, 93 Wn.2d at 840.

The trial court denied Thompson's motion to suppress. Thompson, 93 Wn.2d at 840. The Washington State Supreme Court reversed. The court held Thompson's detention violated the Fourth Amendment because the trooper "lacked a reasonable suspicion, based on objective criteria, to believe that [Thompson] was involved in criminal conduct." Thompson, 93 Wn.2d at 843. The court concluded the fact that someone in the Cadillac waved a handgun earlier on the highway did not create a

reasonable suspicion that Thompson was involved in criminal activity. Thompson, 93 Wn.2d at 841. Because the Fourth Amendment requires individualized suspicion, Thompson's "mere proximity" to occupants of the Cadillac independently suspected of criminal activity did not justify the stop. Thompson, 93 Wn.2d at 841.

Here, unlike in Thompson, the 911 calls reported a woman and a man were involved in a robbery and assault at the Everett Mall Ulta Beauty store. A female and a male were seen fleeing the store together after committing a crime, walking in the same direction toward Red Robin. The 911 reports described the man and stated he was carrying a purse. The police officers could reasonably infer the male suspect was carrying a purse that belonged to the female suspect.

Sydner argues that even if sufficient facts warranted the detention, Officer Hackett had no basis to conclude he was the person identified by the police dispatch. Sydner claims neither officer testified about his hairstyle. Sydner claims he matched the description of the male suspect in only one respect—that he was wearing black clothing and khaki boots. Sydner points out that when Officer Hackett detained him, he was alone, he was not carrying a purse, and he is not a white male.

Sydner's argument ignores several critical and undisputed facts. Officer Hackett contacted Sydner within a few hundred yards of the location of the crime and within minutes of the report about the crime. Sydner was near the Red Robin where the suspects were headed after leaving the store. Sydner was wearing clothing and boots that exactly matched the description of the male suspect.

The court also expressly addressed whether there was reason to believe Sydner

is a white or a black male:

> Defense counsel identifies Mr. Sydner as a black male in her briefing. The state refers to Mr. Sydner as being a white male. The court does not know how Mr. Sydner self-identifies his race, but observed his skin color to be such that . . . the court would not presume to identify Mr. Sydner as belonging to any one racial category. His skin tone is light.

We defer to the court's finding based on the court's observation of Sydner. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

The unchallenged findings support the conclusion that Officer Hackett's determination that Sydner matched the description of the suspect was reasonable.

Protective Frisk

Sydner asserts that even if his initial detention was lawful, there were no objectively reasonable concerns for officer safety to justify a pat-down search and no facts from which the officer could infer he was armed and dangerous.

A limited pat-down for weapons is justified during an investigatory detention when an officer reasonably believes that the individual may be armed and dangerous. Terry, 392 U.S. at 24; Garvin, 166 Wn.2d at 250; State v. Xiong, 164 Wn.2d 506, 511-12, 191 P.3d 1278 (2008). "The officer need not be absolutely certain that the individual is armed." Terry, 392 U.S. at 27. The question is "whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." Terry, 392 U.S. at 27. The record must establish (1) the officer justifiably stopped the person before the frisk, (2) the officer had an objectively reasonable concern of danger, and (3) the scope of the search was limited to finding weapons. State v. Setterstrom, 163 Wn.2d 621, 626, 183 P.3d 1075 (2008).

We consider the entirety of the circumstances to determine the validity of a protective search. State v. Glossbrener, 146 Wn.2d 670, 679, 49 P.3d 128 (2002). The purpose of a limited weapons frisk is not to discover evidence of a crime but to allow the officer to pursue the investigation without fear. State v. Hudson, 124 Wn.2d 107, 112, 874 P.2d 160 (1994). A frisk is limited to a pat-down of the outer clothing for weapons that could be used to cause injury. Hudson, 124 Wn.2d at 112. Once the police officer ascertains that there is no weapon, no further intrusion is justified. Hudson, 124 Wn.2d at 113. Courts are generally reluctant to second-guess the judgment of officers in the field and will uphold the validity of a frisk based on a founded suspicion that is neither arbitrary nor harassing. State v. Collins, 121 Wn.2d 168, 173, 847 P.2d 919 (1993); State v. Belieu, 112 Wn.2d 587, 601-02, 773 P.2d 46 (1989).

A police officer may use additional measures such as handcuffs to restrain a suspect during a Terry stop and protective frisk when there is a legitimate fear of danger. State v. Wheeler, 108 Wn.2d 230, 235-36, 737 P.2d 1005 (1987) (investigatory stop did not exceed permissible scope when suspect was handcuffed, placed in a patrol car, and transported a short distance); State v. Williams, 102 Wn.2d 733, 740, 689 P.2d 1065 (1984) (law enforcement officers exceeded the lawful scope of an investigative detention where instead of questioning the suspect, they detained the suspect for a substantial period and continued the investigation).

Officer Hackett testified at the CrR 3.6 hearing that he placed Sydner in handcuffs and frisked him for weapons because of safety concerns. Officer Hackett noticed a bulge in the front pocket of Sydner's pants. Officer Hackett testified that he directed Sydner to sit down to decrease the likelihood that Sydner would attempt to flee

or otherwise create a dangerous situation. Despite repeated commands, Sydner refused to sit down and angrily insisted that Officer Hackett detained "the wrong guy." Officer Hackett testified that Sydner "slightly" raised his hands to his mid-chest, continued to stand, and looked around from left to right and toward the nearby steep eight-foot drop-off. Officer Hackett warned Sydner that he would place him in handcuffs unless he sat down. Sydner still refused. Officer Hackett testified:

> At this point he matched the suspect's description. I didn't know his involvement in the case. He was not cooperating with simple commands in my opinion, and it was for his — my safety to control him and be able to conduct my investigation in a safe manner.

The reported robbery and the location of the detention also raised safety concerns:

> The nature of the incident, it was a reported robbery, and my experience with crimes of that nature, people are often and frequently armed with some nature of weapon, whether it was used for the commission of the crime or simply opening packages. You know, there is a multitude of ways. At that point I had seen bulges in his clothing that I didn't know what they were. He was not cooperative with things I was telling him.
> I was the only officer on scene, and it was at that point a very — the corner we were in is a difficult to access alley part of the parking lot, and it was for that reason to make sure that there is nothing he could use to harm me.

When asked why placing Sydner in handcuffs did not address his safety concerns, Officer Hackett testified that handcuffing Sydner would not necessarily ensure that he could not access a weapon in his pocket.

The trial court concluded the uncontroverted testimony supported the conclusion that the protective frisk was for safety reasons and did not exceed its permissible scope:

f) The officer's decision to direct Mr. Sydner to sit down and, when he did not comply, to handcuff and then frisk him for weapons, were made for officer safety reasons, and were reasonable under the circumstances.

g) During the frisk, the officer discovered a hard, cylindrical shaped object that the officer could not identify by touch. He therefore

11

      pushed it out of the defendant's clothing, observed that it was a hard plastic container, and placed it on top of his patrol car. The frisk and means by which the officer obtained the unknown object from Mr. Sydner's clothing did not exceed the scope of a permissible weapons frisk.

h)    It was not until after Mr. Sydner's name became known and it was learned that he had a warrant for his arrest, that Mr. Sydner was formally arrested. It was after this event that the officer looked at the cylinder closely enough to determine, based upon his training and experience, that it likely contained narcotics.

i)    Based on the foregoing, the court finds that Mr. Sydner was not unlawfully detained and that the officer's weapons frisk did not exceed the scope of a permissible weapons pat down.

Sydner cites Xiong to argue the frisk was unlawful because 1) there was no information that the reported crime involved use of a weapon, 2) he made no threatening movements, and 3) Officer Hackett placed Sydner in handcuffs before he frisked him. Xiong is distinguishable.

In Xiong, several police officers went to a residence to serve Kheng Xiong with an arrest warrant. Xiong, 164 Wn.2d at 508. One of the officers mistakenly believed Bee Xiong was Kheng. Xiong, 164 Wn.2d at 509. The officers handcuffed Bee and immediately frisked him. Xiong, 164 Wn.2d at 509. One of the officers noticed a bulge in Bee's front pocket and when the officer touched the bulge, Bee appeared to pull away. Xiong, 164 Wn.2d at 509. Believing that the bulge was a potential weapon, one of the officers reached into Bee's pocket and pulled out a glass pipe. Xiong, 164 Wn.2d at 509. The officers arrested Bee for unlawful possession of methamphetamine. Xiong, 164 Wn.2d at 509.

The Washington Supreme Court held the frisk was unlawful because the record established the officers had only "generalized" concerns about safety, Bee was cooperative and identified himself from the beginning, and nothing in the record

indicated that he posed a danger to the police. Xiong, 164 Wn.2d at 514. The court notes Bee "made no movements that could be interpreted as an attempt to retrieve a weapon" and "gave no indication that he could reach his pants pocket while he was handcuffed, nor did he attempt to do so." Xiong, 164 Wn.2d at 513. The court also notes that at the suppression hearing, the police officers who testified "did not express a concern that Bee could access a weapon." Xiong, 164 Wn.2d at 510.

Unlike in Xiong, the uncontroverted testimony established Officer Hackett had reasonable safety concerns that supported the need to conduct a frisk for weapons. Officer Hackett responded minutes after the report of a robbery and assault. Officer Hackett noticed items he could not identify in Sydner's hands and a "bulge" in the front pocket of his pants. It was "completely dark" outside when Officer Hackett approached Sydner. They were in a deserted and dimly lit alleyway out of public view.[4] Officer Hackett was alone. And unlike the suspect in Xiong, Sydner was not cooperative. It is undisputed that Sydner refused to comply with Officer Hackett's repeated commands to sit down and instead continued to stand, raised his hands slightly, argued, and looked left and right toward the nearby drop-off. Officer Hackett testified he believed Sydner also posed a danger because of the bulge in his front pocket. Sydner contends the location, timing, and conditions of the detention have no bearing on whether he posed a safety concern. But police officers must rely on their experience and observations to determine when "the situation reasonably appears dangerous." Setterstrom, 163 Wn.2d at 627. The record supports the conclusion that the limited protective frisk was lawful.

Sydner also argues the search exceeded the permissible scope of a weapons frisk when Officer Hackett removed the cylindrical object from his front pants pocket.

---

[4] The recitation of facts in Xiong does not indicate the timing.

Sydner claims Officer Hackett knew the object was not a weapon. The unchallenged findings and testimony do not support his argument. The unchallenged findings state Officer Hackett "felt a hard, cylindrical item in the male's pocket that the Officer did not know what it was" and "[d]uring the frisk, the officer discovered a hard cylinder shaped object that the officer could not identify by touch." Officer Hackett testified he did not know what the hard object was but thought it might be "something that could be used or could contain a weapon," so he removed the item and placed it to one side. If, based on its size and density, a law enforcement officer feels an object of questionable identity that might be a weapon, the officer may take action necessary to examine that object. State v. Russell, 180 Wn.2d 860, 869, 330 P.3d 151 (2014). A police officer need not be able to conclusively identify an item as a weapon before removing it. Hudson, 124 Wn.2d at 112-13.

We affirm denial of the motion to suppress and the conviction for possession of a controlled substance committed while on community custody.

WE CONCUR: